BOYD et al. v. AMERICAN NAT. INS. CO.—103 S. W. (2d) 338.

Middle Section.   November 28, 1936.

Petition for Certiorari denied by Supreme Court, March 27, 1937.

W. M. Fuqua and R. C. Boyce, both of Nashville, for complainants.

Fyke Farmer and Bass, Berry & Sims, all of Nashville, for defendant.

DeWITT, J. This suit was brought by B. B. Boyd and his assignees, W. M. Fuqua and Donelson Bank & Trust Company, to recover of the American National Insurance Company certain renewal commissions accruing from and after the month of August, 1931, to Boyd as the general agent of said company, under two agency contracts between Boyd and the company, dated October 1, 1925, and August 15. 1927, respectively.

The defendant company in its answer denied any liability for said renewal commissions, on the ground that Boyd had breached certain provisions of his contracts, upon the fulfillment of which his right to renewal commissions depended; the company having terminated his contract by letter dated October 15, 1931, after written demand had been made by it upon him, for the payment of certain funds which he had recieved and failed to pay over to the company, in violation of section 14 of the contract.

The chancellor sustained this defense and dismissed the bill; but he also sustained a cross-bill filed by the company and rendered a decree against complainant Boyd for the sum of $2,328.47, which was the aggregate of sums of indebtedness found by him due from Boyd to said company amounting to $1,973.27, with interest from the date of the filing of the cross-bill, which was October 27, 1932.

The real parties complainant in interest are the Donelson Bank & Trust Company and W. M. Fuqua, assignees, since the amount of renewal commissions accrued and to accrue would probably not far exceed the sum which B. B. Boyd owes to said parties, and to secure which he assigned his claim to renewal commissions.

All of the complainants have appealed from the decree of the chancery court. The assignments of error filed in their behalf involve the questions of the right of the company to refuse payment of the renewal commissions and consequently the correctness of the decree dismissing the original bill, sustaining the cross-bill and awarding the recovery thereunder, as set forth.

B. B. Boyd was a general agent or manager representing the American National Insurance Company of Galveston, Tex., with

headquarters at Nashville, for many years' prior to October 15, 1931. Under his contracts, which in general are very similar to each other, he was entitled to commissions at stated percentages on renewal premiums for certain periods of time on policies in said company written by him or through his agency, but subject to certain contingencies, chiefly those set forth in section 14 of the 1927 contract, which is substantially similar to the corresponding section of the 1925 contract, and which is as follows:

"All moneys or securities received or collected for or on behalf of the Company by the Manager shall be securely held by him as a trustee and shall not be used by him for any personal or other purpose whatsoever; but shall be remitted to the Company at the time and in the manner provided in Section 11 hereof; and if the Manager shall withhold any funds, policies, securities or receipts belonging to the Company, or to a declined applicant, after the same shall have been demanded from the Manager in writing by the Company, then such dereliction shall immediately and without further notice work an unconditional forfeiture of all claims and demands whatsoever of the Manager accrued or to accrue under this agreement, but nothing herein contained shall be construed to affect any rights or claims of the Company against Manager."

On October 15, 1931, the company by letter made a formal demand upon B. B. Boyd for the immediate payment of $732.16, representing moneys which it claimed had been collected by him on behalf of the company while he was acting in the capacity of manager, the same having been retained by him and not turned over to the company upon demand of its cashier. The letter stated that this sum was made up as follows: $368.75 which Boyd had collected on some rent notes which had been placed in his hands by the company for collection; $343.98 alleged to have been collected by him to be applied on premiums of the Davidson County School Teachers Association on a group policy; and $19.43 representing two checks sent to the Davidson County School Teachers Group by the company, representing cancellation. There is no dispute as to the first two of these claims, but it is admitted that the claim of $19.43 was not a valid one against Boyd and it was not insisted upon.

The company did not pay over any renewal commissions after the month of August, 1931. Boyd owed it a balance of $617 and interest for borrowed money, which he was paying at the rate of $123 per month, and after deducting said $123 payment for the month of September, and a proportionate part thereof for the month of October, there would be still due on account of renewal commissions on October 15, 1931, the net sum of about $350 had not the contract been terminated by a notice given shortly after said date to Boyd for his failure to comply with the demand. The Insurance Company, by amendment to its answer to the original bill, set forth other sums

which Boyd had collected and which it charged that he had appropriated to his own use without accounting to the company therefor —the discovery of these items and alleged misappropriations having been made by the company after the filing of the original answer; and the company then charged in its amended answer as an additional ground of defense that Boyd had been guilty of such unfaithfulness, dishonesty, and gross misconduct toward the defendant while acting as agency manager as would bar any recovery against it as a matter of law, independently of any of the provisions of the contract.

Another provision of the contract bearing upon these issues is in section 11, which is as follows:

"The Manager shall keep current and accurate record of all transactions for account of the Company. and shall each week (and at other times when requested by the Company) make a detailed report to the Company on blanks furnished for that purpose, showing accurate accounting of all premiums and other money received for or on behalf of the Company. Said premiums and other monies, less any commissions on first years premiums to which the Manager may be entitled under this agreement, must be remitted with such reports to the Company at its head office. He shall also return any policy not delivered and not paid for within sixty days of date of issuance and during the lifetime and good health of the person on whose life it is issued, and any receipts for renewal premium more than thirty-one days overdue; provided, however, that if the Company now employs or shall hereafter employ in the agency office of the Manager a Cashier, directly accountable to the Company, the Manager shall, if so instructed in writing by the Company, pay over to such Cashier immediately upon receipt thereof all monies received by him for account of the Company and the return of policies and receipts herein required shall be made to such Cashier instead of the Company at its head office."

The chancellor found and held that complainant Boyd did violate the aforesaid section 14 of the contract by withholding funds belonging to the defendant Insurance Company after the same had been demanded from him in writing, and that the defendant company was therefore not liable to any of the complainants for any renewal commissions under said contracts with the complainant B. B. Boyd.

The sum awarded by the chancellor against Boyd is made up of the following items:

Balance due on note .................................$617.00
    Plus interest from 9/1/31 to 10/27/32, date of filing
    of cross-bill in this cause ........................ 42.88   $  659.88

Rent notes collected by cross-complainant Boyd ..............   368.75
    Less 5% commission for collecting same .......... 18.44   350.31

And the following premiums or premium loans collected
    by said Boyd and not remitted to the cross-complain-
    ant:
Davidson County Teachers premiums .................$343.98
    Premium on policy of Leslie and Charlsie Mai Burrus  83.40
Douglas C. Hooper, premium loan.................. 535.70   963.08

Total .................................................. $1,973.27

As aforesaid, interest was added thereon from the date of the filing of the cross-bill in this case.

The premium on the Burrus policy, $83.40, and the Douglas C. Hooper loan of $535.70, were not included in the demand of October 15, 1931, as it was not known to the company until some time thereafter that Boyd had collected these sums. It is insisted that Mr. Boyd had paid these sums to the company, but the evidence does not preponderate against the finding that he received these sums and did not account for them. On the day he received the letter of demand of October 15, 1931, Mr. Boyd wrote the company requesting that the amount demanded by the defendant be deducted from the renewal commissions due or thereafter to become due. The company never replied to said letter, but by letter of October 20, 1931, it wrote to Boyd claiming that he had forfeited all renewal commissions by reason of failure to pay the sums demanded in the letter of October 15, 1931.

### Rent Notes.

The company had turned over to Boyd certain notes given for rental on property owned by it in Nashville. He collected $350.31 on these rent notes, and on October 11. 1931, he signed a statement admitting that he had done so and that he owed the company this amount; but he undertook to excuse his failure to remit on the ground that some one representing the company had agreed to allow him a commission for collecting the notes; and that not having heard from the company regarding that commission he had failed to remit the proceeds of his collections. He really collected $368.75, and his commission at 5 per cent. would have been $18.44, leaving $350.31 due the company. The chancellor allowed the commission and no complaint is made of this allowance. It appears that the company had been unable to get remittances from Boyd or replies to its letters and telegrams demanding information and reports concerning these rent notes.

On July 2, 1931, Boyd wrote a letter to the company inclosing checks remitting for the collection of two notes and promising to

remit for the balance by the last of the week. The promised remittance was not received, but the company continued to demand a reply and settlement.

A demand was made on August 28, 1931, by telegraph, but no reply was made. As aforesaid, Mr. Boyd requested the company to deduct these, among other items, from the renewal commissions claimed.

Premiums on the Davidson County Teachers Policies.

Through Boyd's agency the company had been carrying a group insurance to the Davidson County Teachers Co-operative Association, a large number of teachers being thus insured under certificates issued with the policy. The premium on this policy was payable annually. A premium of $996.76 became due on January 1, 1931. This had to be paid within the grace period of thirty days, or by January 31, 1931, otherwise the policy would have lapsed. On January 26, 1931, the financial secretary of the association paid to Mr. Boyd $600 on this premium; on February 2, 1931, $200; on February 13, 1931, $110—amounting in all to $910. This lacked $86.76 of covering the annual premium on this policy. In January, 1931, Mr. Boyd remitted to the company the semiannual premium of $478.21, with his receipt for commission, amounting to $25.17, although he had in his hands the sum of $600. He did not inform the company that he had received the total sum of $910. His excuse is that as he never received a sufficient sum to pay the full annual premium in January, he had to arrange to place the premium on a semi-annual basis in order to keep the policy alive. At the end of January, 1931, the balance of the annual premium was $396.76, and this had not been paid by the association. After February 13, 1931, the balance was $86.76, which was not paid. When the semiannual premium for the last half of the year 1931 became due, Boyd sent a telegram to the company, as follows: ''Necessary to change Teachers Group to monthly premium. Wire rate.'' The premium was then placed on a monthly basis by the company in accordance with Boyd's request, and he remitted to the company for the amount of the July premium, $82.07, by sending his check for $62.04 and returning two checks of $13.60 and $5.83, respectively, which represented refunds of unearned premium due the association because of certain cancellations under the group policy. Although Boyd had in his hands ample money to pay the full monthly premium, he sent them back to the company with the request that they be applied on the premium. The company refused to accept the checks because they were not indorsed. Then Boyd presented these checks to Mrs. Allen, the financial secretary of the association, and asked her to indorse them, stating that they were checks due him as commission. In accordance with his request she indorsed the checks and turned them back to him. They were then treated as payments on the monthly premium. This

left in Boyd's hands the balance of the sum which had been paid to him in January and February less the amount paid by him to the company in January and $62.04 remitted in July. Boyd became the beneficiary of these two checks.

Mrs. Allen testified that she never agreed for the premiums to be placed on semiannual or monthly basis; that she wanted to be sure that the premium was on an annual basis. She said that she did not learn until July, 1931, that the premium had not been put on an annual basis for that year. It seems that it had been on a semiannual basis for the year 1930. She received a notice from the company that the premium was on a monthly basis, and she went to see Mr. Boyd, and she said that Mr. Boyd said that it was a mistake and he would take care of it, but he did not say whose mistake it was. No further remittance on account of the premium on this group policy was made to the company by Boyd. On September 28, 1931, Mrs. Allen wrote a letter to the company asking for information as to the premium on this policy, stating that the annual premium had been paid, and that the premium should have been on an annual basis. In October, 1931, Mr. Clarke, the company's auditor, came to Nashville for a further investigation of Mr. Boyd's office. His duty was limited to the investigation of the books and premium receipts in the hands of Mr. Boyd as manager. He testified that at that time he did not know that the company had discovered previously that Mr. Boyd had collected premiums on policies and had not paid them over to the company at the time they should have been paid; and that he did not know that Boyd had collected the rents. When he discovered the facts in connection with the association policy, Mr. Boyd admitted that he had not paid over the entire premium collected therefor, and he signed a statement, which is a part of the record, admitting that he owed the company on this account $363.87. This statement is dated October 8, 1931.

### Burrus Policy.

The annual premium in the sum of $83.40 on the joint policy on the lives of Leslie C. Burrus and wife, Charlsie Mai Burrus, became due January 3, 1930. It was paid to Boyd by Mrs. Burrus on March 5, 1930, by a check drawn on the American National Bank. Boyd did not remit to the company for this collection, and consequently an automatic premium loan was placed on the policy. Mrs. Burrus paid the annual premium for the year 1931 without knowledge that the 1930 premium had not been remitted to the company by Boyd.

In 1932, after the termination of Boyd's contract with the company, the annual premium for that year, amounting to $83.40, was paid by the check of Mrs. Burrus. At the time this check was delivered to Mr. E. H. McAtee, the manager of the Nashville office of the industrial department of the defendant company through which the collection of renewal premiums was then being handled, T. B.

Boyd, brother of the complainant B. B. Boyd, also paid interest of $5.32 on the 1930 premium loan which was then unpaid.

The company thereupon wrote Mr. and Mrs. Burrus on March 5, 1932, calling their attention to the fact that there was a premium loan on the policy due to the fact that the 1930 annual premium had not been paid. Mr. Burrus then consulted his attorney, Mr. James A. Newman, and the latter advised the company that the 1930 premium had been paid to Boyd. The company requested that the canceled check evidencing this payment be forwarded to it. Mr. Newman complied with this request and sent to the company checks representing premiums for the years 1930, 1931, and 1932, respectively. On June 7, 1932, the company made a formal written demand upon Mr. Boyd for the payment of $83.40, the amount of the 1930 premium. Boyd made no acknowledgment of the receipt of this letter and has not paid this premium to the company.

## Hooper Policy.

The 1929 annual premiums on the two policies of Douglas C. Hooper of Smithville, Tenn., amounted to $535.70. These premiums were not paid to the company and an automatic premium loan for the amount thereof was placed against the policies. On May 15, 1930, Mr. Hooper gave his check drawn on the First National Bank of Smithville in the sum of $535.70, the amount of the premiums, payable to B. B. Boyd. On the same day Boyd went to the First National Bank of Smithville, indorsed the check, and obtained a cashier's check for the same amount payable to his order. He presented this cashier's check to the Liberty Bank & Trust Company at Nashville on May 16, 1930, receiving $135 in cash and depositing the balance of $400.70 to his individual account. The collection of this premium was never reported to the company by Boyd, and it was not discovered until shortly prior to April 1, 1933, when Hooper sought to cash the surrender value of the policy. Upon discovery of this shortage the defendant company made formal demand upon Boyd on April 1, 1933, for this sum of $535.70, but this amount he has never paid to the company.

It is first insisted that certain facts connected with these policies point strongly to the fact that Boyd did remit the premiums. It appears that it was the duty of the defendant company when an annual premium was not paid to place an automatic premium loan on the policy immediately and give the policyholder notice thereof, and that thereafter the policyholder was sent an annual statement of the interest on said automatic loan, together with a statement of the annual premium. The automatic loan was placed on the Burrus policy on March 10, 1930, and on the Hooper policy October 18, 1929. The company claims to have discovered in June, 1932, that the 1930 premium on the Burrus policy had not been remitted, and to have discovered in April, 1933, that the 1929 premium on the Hooper

policy had not been remitted. It is argued that because neither Mr. nor Mrs. Burrus received any notice of the automatic loan, and it does not appear that Hooper received such notice, the premiums must have been remitted by Boyd. But it does appear that in each case Boyd got the cash on the check; and he not only paid the interest on the loan of $150 made on the Burrus policy, but he also paid the company $5.32 interest on the premium loan which had been placed on the policy. Both Mr. and Mrs. Burrus testified that neither of them paid any interest on any premium loan and did not know even that there was a premium loan against the policy until receipt of a letter from the company advising them of this in March, 1932.

Mr. Boyd claims that if he did not remit these premiums it was due to oversight or mistake. We think that this payment of the interest on the loan and the premium loan on the Burrus policy shows that he knew that the premiums had not been remitted. As to the Hooper premium of $535.70, his explanation is made difficult by the fact that on the same day he received the check from Hooper he took it to the Smithville bank and obtained a cashier's check payable to himself; that this check he carried to the Liberty Bank & Trust Company at Nashville where he kept a personal account; and that he deposited $470 to his individual credit and received $135 in cash. Mr. Boyd frankly stated that he had no independent recollection of these transactions; that he was remitting from $6,000 to $8,000 monthly in premiums to the company; and that checks might have been cashed to take up returned or dishonored checks for renewal premiums. It was a rule of the company that no returned renewal check should ever be charged against its account. He did not specifically say that this was his reason for cashing the Burrus and Hooper checks.

At the time the demand was made of Boyd in October, 1931, there was another premium which Mr. Boyd had collected from Mr. Mitchell of Livingston, Tenn., amounting to $149 and had not accounted to the company for it. This fact was not known to the company at that time. In fact, this was made up of two annual premiums of $74.50 each. The first of these became due July 5, 1929. It was paid to Boyd by Mitchell on August 1, 1929, by check drawn by Mitchell on the Farmers Bank of Livingston, payable to the order of B. B. Boyd, manager. It was indorsed by Mr. Boyd and collected by him through the Third National Bank of Nashville, but was not remitted to the company and he did not report the collection of it. On account of this failure the company placed an automatic premium loan against the policy and the next annual premium became due in 1930, and was paid by check of Mitchell drawn on the Farmers Bank of Livingston for $74.50, payable to the order of the American National Insurance Company, and it was indorsed by Boyd in the name of the company and collected through the Donelson Bank & Trust

Company. This collection was not remitted to the company nor reported to it by him. The company placed an automatic premium loan against the policy for. the amount of this premium. The fact that these premiums had been thus collected and not paid over to the company was discovered on October 13, 1931, when the company's agent at Livingston wrote a letter to the company for Mitchell making application for the loan value of the policy. The company replied advising that the policy had been consumed ˙ with the automatic premium loan indebtedness. Thereupon Mr. Gore, an attorney at Livingston, in behalf of Mitchell, wrote to the company˙ giving the dates of the various premium payments. The company replied that it had not received these premiums. Mr. Poston by letter informed Mr. Boyd that he had ascertained that these premiums had ˚ not been paid over to the company, and Boyd went to Livingston and agreed to settle with the company for the premiums. On November 25, 1931, he sent his check for the amount covering the 1929 and 1930 premiums. Mr. Boyd testified that he did not know how he happened to overlook these items for more than three years; that in handling premiums running from $5,000 to $8,000 each˙ month it would be easy to overlook. He did not state by what authority he indorsed the checks for these premiums payable to the company and obtained the money on them.

.There were other irregularities of similar kind which were known to the company and which were settled prior to the demand made in October, 1931. There was a premium of $27.05 due on August 7, 1930, on a policy held by one Pack. It was paid to Boyd on September 5, 1930, but on account of the fact that Boyd did not report the payment to the company an automatic premium loan was placed on the policy by the company and the policyholder was notified. The policyholder informed the company that he had paid the premium to Boyd and held his receipt. When this was brought before Mr. Boyd, ˙ he remitted to the company for the premium on November 12, 1930.

Dr. W. D. Martin had a premium of $20.80 falling due December 9, 1929, and he paid it to Boyd on December 17, 1929. On account of Boyd's failure to remit the premium to the company, an automatic premium loan was placed on the policy. This caused the policy to lapse on November 28, 1930, and on December 16, 1930, the company notified the policyholder of the lapse of the policy. Dr. Martin thereupon wrote to the company and inclosed his canceled ˙ check showing that the premium had been paid to Boyd. When Boyd was apprised of these facts he, on December 30, 1930, wrote to the company and remitted for the premium and made an explanation of his failure to remit the premium by stating that Dr. Martin delivered the check to him with the understanding that he was to hold the check until Dr. Martin could get in touch with him and arrange

to obtain the cash value of the policy. Dr. Martin testified that he could not remember definitely about this, but he admitted on cross-examination that he might have had in his mind at that time that he would not carry the policy much longer. The evidence presents some doubt as to whether or not the check was given without any condition for the payment of the premium.

A similar thing occurred in regard to the premium of Mr. Bradford of Murfreesboro which fell due July 27, 1930, amounting to $78.80 and which he paid two days thereafter by cashier's check on the Murfreesboro bank, payable to the order of the American National Insurance Company. Mr. Boyd received this check, indorsed it in the name of the company by himself as manager, and deposited it to his own credit in the Liberty Bank & Trust Company at Nashville. The company had no account in that bank. The premium was not remitted until October 28, 1930, when the facts were reported to Mr. Boyd after the company had placed an automatic premium loan upon the policy. Mr. Boyd was unable to give any reason why he failed to deposit this check to the credit of the American National Insurance Company in one of its accounts in the Nashville banks.

In April, 1932, Mr. Boyd was manager for the United Mutual Life Insurance Company at Nashville. One Grannis, a holder of a policy in the American National Insurance Company, sent to Boyd a check for $65.88 for payment of premium thereon, payable to B. B. Boyd, manager. Boyd indorsed this check and placed it to his own credit. Mr. Boyd testified that after several weeks the American National Insurance Company advised him that he had received a check from Mr. Grannis that belonged to it, and advised him to return the premium to Mr. Grannis, which he did. He testified that he paid it over to Mr. Grannis.

The annual premium on the policy issued by the American National Insurance Company to one Brizzolari, amounting to $61, became due September 24, 1930. There was a loan against the policy for $150. On September 23, 1930, Mrs. Brizzolari paid Mr. Boyd the sum of $211, and he gave to her his receipt showing that said sum was in payment of the loan and the premium. Mr. Boyd did not remit the entire amount to the company, but on October 28, 1930, he sent the amount of the premium, $61, plus $9 as the annual loan interest, and the company extended the loan for another year. On June 22, 1931, Mrs. Brizzolari wrote a letter to the company asking that a receipt for the loan be sent to her. The company immediately advised her that its records showed the payment of the annual premium of $61 and interest of $9, but did not show that the loan had been paid, and asked that she send her canceled check or receipt. She sent to the company the receipt. On July 6, 1931, the company forwarded to Mr. Boyd a photostatic copy of her letter and a copy of a letter which it had received from the cashier in Boyd's

office stating that Mr. Boyd had not remitted to her for the loan of $150, and asked Boyd for a full explanation. He made no reply to this letter, and on July 16, 1931, the company wrote another letter to him about it and asked for an explanation without further delay. On July 21, 1931, Boyd wrote to the company stating in substance that Mrs. Brizzolari had agreed to lend him the money on condition that she would not have to pay interest on the loan. Mrs. Brizzolari testified that when she paid the money to Boyd there was nothing whatever said about lending him the money. On the other hand, Boyd promised to send her an official receipt of the company within a week or two. Mr. Brizzolari testified that as soon as he learned that the company had not received the amount of the loan from Boyd, he went to see him and thereupon Boyd remitted the money to the company. This occurred in July, 1931. After the discovery of these facts the company wrote to Boyd under date of July 25, 1931, criticizing his conduct and stating that his actions were in direct violation of the rules of the company, and requesting from him a written statement as to whether or not he had in his possession at that time any monies whatever belonging to the company for premiums, policy loans, etc. Mr. Boyd made no reply to this letter.

Evidently the company wished to be lenient with Mr. Boyd and retain him in its service, for although early in August, 1931, it directed Mr. Boyd to turn over to G. C. Clark, manager of its industrial department, all moneys, books of account, documents, vouchers, and all other papers of whatsoever character then in his possession connected with the business of the company; its manager of agencies explained to Mr. Boyd that thereby the company had no idea whatever of disturbing his contract to write business for the company; and on August 25, 1931, he wrote another letter to Mr. Boyd in which he said: ''I want to urge you to remain with the Company and shall await your reply with considerable interest.'' Mr. Boyd quit the service of the company because he said that all of his material and records were taken from him. On September 14, 1931, the manager of agencies wrote him another letter in which he said: ''I regret very much that you have taken the attitude that you have in all of my letters to you, since transferring the collection of the business to our Industrial Office. I have tried to make it clear to you that your contract remained in force in our files and that we wanted you to continue to represent the Company in the procuring of first year's premiums.'' On October 2, 1931, the same official wrote to Mr. Boyd giving him formal notice of the termination of his contract since Boyd was at that time representing another insurance company, but he also said: ''Personally, I sincerely regret to see you take this action as I would like to have seen you remain in the service of the American National.''

Mr. Boyd at first objected to complying with the request that he make the transfer to Mr. Clark, but he finally permitted Mr. Clark to make an audit and he turned over to him all the books and records of the company in his possession. From this audit it appeared that Mr. Boyd's records were in proper condition, and it did not reveal that he had collected certain other premiums and funds belonging to the company which had not been remitted. There was no immediate way of ascertaining that Boyd had collected other premiums from policyholders, unless he made a record of them in his office.

We do not think that the statements thus quoted from the letters of the manager of agencies, and the fact that the company, according to the lights then before it, was willing to retain Mr. Boyd in its service as a solicitor of insurance and collector of first year's premiums, raised any estoppel upon the company to deny its liability for the renewal commissions claimed. Neither its letters nor its conduct in seeking thus to retain him caused Mr. Boyd to alter his position for the worse. We are not prepared to say that the company was not within its rights in taking from him the books and records and establishing another agency for collection and remittance of renewal premiums, in view of the irregularities of which it knew, culminating in the trouble over the Brizzolari policy.

Now it must be determined whether or not, because of the transactions which have hereinbefore been recited, the company should be allowed in a court of equity to deny to Mr. Boyd and his assignees (who are the real parties in interest) the right to claim these renewal commissions, which seem to amount to $10,000 or more.

It will be noticed that under the contract the right to renewal commissions was not to terminate merely in the event of discontinuance of the employment; but only upon a violation of section 14, hereinbefore recited, the details of performance of which are set forth in section 11; or of a violation of section 21, which provides that if the manager after the termination of the contract from any cause, should at any time directly or indirectly induce or influence or attempt to induce or influence any policyholder to lapse his policy in the company or induce or attempt to induce and influence any agent or employee of the company to quit its service, then in any such event he should not receive any further renewal commissions. It should be stated here that it was charged by the company in its pleadings that this section 21 had been violated, but we concur with the chancellor that the evidence is insufficient to justify a finding of such violation.

In the brief of counsel for the complainants their position is stated as follows:

"It is not our contention that the forfeiture provision in the contract in the case at bar is void or that the Courts could not enforce same if proper, and we concede that under the law of this state the forfeiture provision contained in the contract could be enforced if

the Court should think under the facts that it was proper that said forfeiture clause be enforced. It is our contention, however, and it is the law of this state, that forfeitures are not favored and will be relieved against whenever possible, and that under the facts and circumstances of the case at bar would be unjust and inequitable to enforce the forfeiture clause, especially as against the assignees."

■■ An insurance agent's right to commissions on renewal premiums must be derived from the terms of his contract. In the sense that it was fixed, absolute, free from all contingency, the complainant Boyd had no vested right to the commissions sued for. The plain stipulation was that violation of his duties and obligations under section 14 of the contract shall work an "unconditional forfeiture of all claims and demands whatsoever of the Manager, accrued or to accrue, under this agreement." The parties so contracted. "The modern formula is that every contractual obligation is to be interpreted and enforced in the light of its object and purpose, form being of secondary and evidential value only." Lawrence on Equity Jurisprudence, section 15. In section 152 thereof, as to the modern theory of forfeiture, it is said:

"Present day tribunals, disclaiming prerogative or unregulated discretionary powers, now recognize universally the right of parties sui juris to make their own contracts, determine for themselves the wisdom of their bargains and the adequacy of their consideration, and in the absence of counter-equities based on established principles to compel their judicial enforcement. Courts are not at liberty to revise the contract or speculate on or contravene the intentions or purposes of the parties. Such action would be to make a contract for them which they have not chosen to make for themselves. . . . The whole equitable attitude toward the so-called forfeiture is merely to ascertain and enforce the real rather than the formal agreement, the objective rather than the medium of expression."

■■ It is within the province of equity to relieve against a forfeiture where he who asks help is himself free from inequitable conduct with respect to the same subject-matter. It will not grant such relief when the violation was due to gross negligence or willful misconduct. 1 Pomeroy on Equity Jurisprudence (4 Ed.), section 452; 3 Story on Equity (14 Ed.), section 1740. But we are not here dealing with a provision for "forfeiture," although that word is used in the contract. It is an agreement that upon certain conditions the right to renewal commissions would depend. The failure of the agent to comply with these conditions placed him without the category in which he could rightfully claim the commissions. It was a continuing condition subsequent. Only so long as he performed the duties and obligations specified would he be entitled to the commissions. Whenever he failed to do so he would not be entitled to any further renewal commissions. We think that this

is the correct interpretation of the contract. This view was expressed in the opinions in the analogous cases of Sutherland v. Connecticut Mutual Life Insurance Company, 87 Misc., 383, 149 N. Y. S., 1008, and Thurman v. Rodman, 206 Ky., 180, 266 S. W., 1047.

Even if this may be treated as a question of forfeiture, the facts would justify its enforcement because they are such as were designated in the contract as grounds for forfeiture. There are many decisions holding that an insurance agent forfeits his compensation for his wrongful refusal or failure to account for funds of his principal in his hands. 32 C. J., 1079, and cases cited. We refer especially to Phoenix Mutual Life Insurance Company v. Holloway, 51 Conn., 310, 311, 50 Am. Rep., 21; Ballance v. Vannuxem, 90 Ill. App., 232; Frankel v. Michigan Mutual Life Insurance Company, 158 Ind., 304, 62 N. E., 703. See, also, Annotations in 79 A. L. R., p. 475 et seq.

Our conclusion that the complainant, for his failure to comply with the conditions, has no right to claim these commissions, removes from consideration the contention that he could account to the company by offsets against the claimed renewal commissions. Of course if he was not further entitled to such commissions he had nothing against which a setoff could be made.

It appears that some years before the termination of his agency the company had failed to account to him for renewal commissions which he claimed amounted to about $6,000, but that when a settlement of this matter was made, the amount agreed upon was about $1,900, and this was paid to the complainant. He claims that he accepted this amount almost under duress, but he continued for years in the service of the company under his contract after his acceptance of this settlement. The insistence that those transactions raised any estoppel upon the company, or amounted to such inequitable conduct that it should be repelled, is not sustainable. In other words, complainant cannot be heard to raise this question in this cause after the lapse of years of acquiescence.

It is claimed on behalf of the assignees that they were entitled to notice of these defalcations, and that if they had known of them, they would have satisfied the obligations so as to prevent a loss of the claimed commissions. The assignments, of course, were made subject to the rights of the company and the obligation of the assignor. The assignees are not in the position of innocent purchasers whose rights would be superior to the contractual relations between the original parties. They must be deemed to have known of the provisions of the contract between Boyd and the company and thus to have realized, upon a proper construction of the contract, that their assignor must perform the duties and obligations undertaken by him in order to become entitled to the commissions. Boyd did not inform them of his delinquencies and this of course worked

a hardship upon them; but that was a matter of duty on his part toward them and with which the company was not affected. The rights of the assignees to the commissions were contingent upon the performance of conditions, just as had been the rights of their assignor. We are unable to save the assignees upon the claims which they have made.

It appears that Boyd paid the sum of $520 upon his obligations to this company to the corporate surety upon the bond given by him for the performance of his duties under the contract. The Insurance Company had made demand upon the surety. The evidence does not show that this sum was ever credited to Boyd. It does not appear that the Insurance Company ever received this money. The surety was not the agent of the Insurance Company. We are therefore unable to sustain the claim that this sum should be credited on the indebtedness. The decree dismissing the original bill and sustaining the cross-bill is affirmed. A decree will be entered in this court for the American National Insurance Company against B. B. Boyd for the sum of $2,328.47 with interest from the date of the decree in the chancery court, and all costs of this cause.

Faw, P. J., and Crownover, J., concur.