James P. BAKER, Plaintiff-Appellant,

v.

MISSOURI NATIONAL LIFE INSURANCE COMPANY, Defendant-Respondent.

No. 8198.

Springfield Court of Appeals.

Missouri.

Sept. 30, 1963.

Motions for Rehearing or to Transfer Overruled Nov. 11, 1963.

148

Farrington & Curtis, Springfield, Thomas
Strong, Springfield, for plaintiff-appellant.

Milton B. Kirby, Springfield, Granoff,
Levy & Craig, Kansas City, for defendant-
respondent.

STONE, Judge.

In this jury-waived, court-tried suit at
law, plaintiff Baker of Springfield, Mis-

souri, seeks to recover from defendant, Missouri National Life Insurance Company (hereinafter called the Company), renewal commissions on premiums paid during the months of July 1960 to January 1961, inclusive, on policies of insurance issued by the Company through the efforts of plaintiff as soliciting agent. From the judgment for defendant, plaintiff appeals. A detailed statement of facts is required for an understanding of the issues.

By written contract dated April 25, 1956 (hereinafter referred to as the contract), the Company appointed plaintiff as general agent to solicit business in "Springfield and Southern Missouri." After preliminary recitals and the statement of plaintiff's appointment, the other contractual provisions were set forth in numbered paragraphs grouped under three headings. Twelve numbered paragraphs relating to the agent's responsibilities were placed in *"Part I"* under *"The Agent Agrees."* (All emphasis herein is ours.) Of these twelve paragraphs, we are concerned only with *paragraph 1*, by which the agent agreed "to produce a minimum of 5 applications each calendar month." Three numbered paragraphs pertaining to the Company's obligations were placed in *"Part II"* under *"The Company Agrees."* Of these three paragraphs, only *paragraph 3* is here important: "In accordance with the provisions of this contract, provided the General Agent has been continuously representing the Company for more than one year, renewal commissions, as herein specified, will be paid during his lifetime." Other contractual provisions in seven numbered paragraphs were assembled in *"Part III"* prefaced by *"It is further agreed and understood by the said Company and the said Agent."* Of these seven paragraphs, only *paragraph 5* and a portion of *paragraph 6* are relevant to the instant controversy:

"5. If the Agent shall at any time fail to make report of collections, or fail to deposit or remit the funds of the Company in strict accordance with the terms hereof, or shall in any way injure or divert the business of the Company in said territory or elsewhere or shall violate any of the agreements herein contained, or shall be unsatisfactory or shall write an undesirable or unprofitable business for the Company, the Company may, at its option, terminate this contract by giving five days' notice in writing to the Agent, which action shall release the Company from all liability hereunder, and all commissions or other compensation accrued at the time (of) such termination, or thereafter to accrue, shall be forfeited to the Company as liquidated damages for such violation or action on the part of the Agent. This forfeiture is without prejudice to the Company's rights to secure legal redress as it may deem necessary.

"6. * * * The Agent shall have the right to terminate this contract by giving five days' notice in writing of his desire so to do and settlement and payment of any sums that may be due the respective parties."

Plaintiff acted under the contract until his agency was terminated during the latter part of August 1960. The parties agree that the contract was terminated but they are in violent disagreement (as will hereinafter appear) as to *which party terminated* and *what accomplished or worked the termination.*

Although in many months, particularly during 1958 and 1959, plaintiff's production barely reached the minimum of five applications, he produced not less than that number of applications each month during the period from May 1956 to January 1960. However, his production fell below five applications in February 1960 and thereafter declined further to three applications in March, two in April, one in May, one in June, none in July, and one in August. Upon trial, plaintiff offered two "reasons" for his decreased production, namely, (1) he "wasn't feeling very well" during 1960

and (2) he was "unhappy" because the Company did not make available, as had been promised (so he said), another *non-cancellable* policy in the field of accident, health and hospitalization insurance, for which the overwhelming majority of applications produced by plaintiff were submitted. Plaintiff also testified that on two occasions, to wit, in March 1958 and "in the early Spring of 1960," when he had complained that he did not want to make his "quota" by writing insurance cancellable at the Company's option, Niman (the Company's vice-president) had told him (plaintiff) to write the form of non-cancellable policy then offered by the Company and had assured him that the Company would not cancel the contract "on account of low production." On the other hand, Niman denied having made any such statement and asserted that he frequently had discussed with plaintiff "the matter of his quota production" and that plaintiff "always promised * * * that he would do better and attempt to get his production up to quota and so forth and so on." In any event, the Company continued to issue policies upon applications produced by plaintiff (few in number as they were), an exhibit prepared by the Company showing that as late as August 18, 1960, it had issued Policy No. 128722 to E. Hendricks upon an application solicited by plaintiff.

Throughout the life of the contract, the Company had sent to plaintiff about the fifteenth day of each calendar month a remittance for his renewal commissions on premiums paid during the preceding calendar month, and plaintiff admittedly received all renewal commissions due him on premiums paid during the period to and including the month of June 1960. However, he did not receive a remittance about the middle of August 1960 for renewal commissions on premiums paid during July; and, after waiting a few days, he made inquiry by memorandum dated August 20, 1960, and received at the Company's home office in Kansas City on August 22, which read as follows: "SUBJECT: July state-

ment and renewal check. Since I have not received the above kindly check delay. Thanks." Still having heard nothing from the Company concerning renewal commissions for July, plaintiff called Niman over long distance on August 24. *Plaintiff's version* of this conversation was that, when he asked "what has happened to my renewals," Niman said "you are not going to get no more renewals" but that he (Niman) did not state that the contract was cancelled or that plaintiff no longer represented the Company. *Niman's testimony* concerning this conversation was: "I told him (plaintiff) over the phone, as I told him many times before, that the quota production was not being maintained and, as we previously discussed, *unless he could maintain his quota production he was not entitled to renewals under the terms of the contract,* and that, under the circumstances, *not having maintained his quota production, he was not entitled to renewals.* * * * I was pretty well tied up, and I think I told him on the phone also I was going to write him to that effect. And I asked one of my associates to explain the situation to him and * * * to write him a letter and show it to me before he sent it out." In response to a subsequent question as to whether he (Niman) had told plaintiff that the Company "was terminating the contract," Niman said, "I did."

Whatever the precise language of the conversation between plaintiff and Niman on August 24 may have been, plaintiff was (as he put it) "quite shook up" for a few minutes; and, on the same day, he wrote and dispatched by registered mail the following letter (omitting date, salutation and signature) addressed to the Company and received at its home office in Kansas City the following day, to wit, on August 25:

"This is Official Notice that I am electing to exercise my option, as provided in Part *111*, paragraph 6, in the cancellation of my General Agents Contract, dated April 25, 1956. and this is due notice to that effect.

"I am further demanding that amounts, delayed renewals due me and money *accrueing* from renewals be paid me promptly as per agreement.

"No written complaints have reached me to date as to my performance, while under contract. While I am much displeased with failure of proper performance, on the part of the Company and this is my reason for cancellation of my Contract."

Also on August 24, Hader (the Company's assistant treasurer) wrote and mailed to plaintiff the following unsigned memorandum or letter typed on an "Interoffice Communication" form and captioned *"SUBJECT Commission Statement"*:

"This will acknowledge receipt of your memo of August 20, 1960 regarding your commission statement.

"As you know, we offer an outstandingly high commission rate in exchange for quantity and quality production. Your production has been of small quantity and lacking in quality, and in any event does not measure up to the minimum qualifications as stated in your contract.

"The non-performance has not been on our end; quite the reverse in that it has been on your side. We cannot continue living up to our side and getting very little or almost nothing in return.

"Inasmuch as you have not fulfilled your part of the agreement, we have no alternative than to discontinue ours.

"Further, at any time you show us that you are able to fulfill your end of the agreement and to continue to fulfill your end of the agreement, we shall be only too glad to fulfill ours."

On August 26, Niman wrote and mailed to plaintiff the following letter (omitting date, salutation and signature):

"This will acknowledge receipt of your letter dated August 24, 1960, which presumably is in reply to our telephone conversation of yesterday and in answer to Mr. Hader's letter to you dated August 24, 1960.

"Mr. Hader summed up the situation very well in that you have not been meeting the minimum production qualifications stated in Part I, Paragraph I of your Agency Contract. I have on several occasions discussed production minimums with you and as a matter or record our correspondence file shows many acknowledgments from you stating your intentions to do a better job, at least meet the minimum.

"You have not done this and as Mr. Hader's letter reads, we cannot continue to fulfill our obligation unless you fulfill yours. Therefore, we ask that you return all supplies together with your State License which is the property of the Company. A final accounting of any outstanding collections on premiums, applications or otherwise, must be reported to the Company immediately together with a cashable remittance to cover same.

"It is to your best interest to settle your affairs with the Company in an orderly manner and we must insist that you give this matter your strict and immediate attention and compliance."

*Plaintiff's position* is that he terminated the contract by his registered letter of August 24, 1960, received by the Company at its home office in Kansas City on August 25. *Defendant's theory* (as spelled out in its brief) is that it terminated the contract by a "chain of events," to wit, (1) by the oral statements of Niman in the course of his long distance telephone conversation with plaintiff on August 24, (2) by Hader's unsigned memorandum or letter of August 24, and (3) by Niman's letter of August 26—all of which should (so the Company says) be treated "as one continuing trans-

action leading up to the confirmation of a termination of the contract by defendant (the Company)" because of plaintiff's failure "to produce a minimum of 5 applications each calendar month."

The contract, as drafted by the Company, plainly provided in Part III, paragraphs 5 and 6, for termination by the giving of *"notice in writing."* The nature of notice required by a contract depends upon the provisions of that contract [39 Am.Jur., Notice and Notices, § 11, p. 238]; and the general rule is that, where the manner of exercising a power of termination is specified in a contract, notice will be effective only if given in the stated form, unless compliance with the contractual provision has been waived. 6 Corbin on Contracts, § 1266, loc. cit. 64–65; 17A C.J.S., Contracts, § 400, p. 487. So, "for the most part strict adherence to a requirement of writing is exacted" [1 Merrill on Notice, § 597, p. 653]; and, when the contract calls for notice in writing, notice in the course of a telephone conversation is insufficient to satisfy the contractual requirement. Star-Chronicle Pub. Co. v. United Press Ass'ns., 8 Cir., 204 F. 217, 223; 66 C.J.S., Notice, § 16b, loc. cit. 656. Niman's oral response (whatever it may have been) when plaintiff called him on August 24, 1960, obviously did not constitute, and was no part of, the "notice in writing" contemplated and required by the contract for termination thereof.

■■■ Passing to the second in the "chain of events" upon which the Company relies, namely, Hader's unsigned memorandum or letter of August 24, we observe that the writer designated the *"subject"* of the memorandum as *"Commission Statement"* and, in the opening sentence, referred to "your (plaintiff's) memo of August 20, 1960 regarding your commission statement." After complaining that plaintiff's production "in any event does not measure up to the minimum qualifications as stated in your contract" and commenting that "inasmuch as you have not fulfilled your part of the

agreement, we have no alternative than to discontinue ours," the memorandum closed with the significant statement: *"Further, at any time you show us that you are able to fulfill your end of the agreement and to continue to fulfill your end of the agreement, we shall be only too glad to fulfill ours."* To be effective, a notice of termination must be clear, definite, unambiguous and unequivocal, and it properly may not be so characterized "unless its meaning can be apprehended without explanation or argument." 66 C.J.S., Notice, § 16a, loc. cit. 654. See also 17A C.J.S., Contracts, § 402, loc. cit. 489. Hader's memorandum does not convey to us the thought or idea that the writer thereby purposed to terminate plaintiff's agency, but rather it suggests that Hader, in common with Niman, labored under the mistaken impression (to which we shall return later) that the Company's contractual obligation to pay renewal premiums to plaintiff was conditioned upon his production of not less than five applications each month and that plaintiff's failure to meet that "quota production" in any given month automatically relieved the Company of any contractual obligation to pay renewal premiums for that month. In any event, Hader's memorandum certainly was not a clear, definite, unambiguous and unequivocal notice of termination of the contract and had no efficacy as a notice of termination.

■■■ Part III, paragraph 6, of the contract accorded to plaintiff the right to terminate upon "five days' notice in writing of his desire so to do and settlement and payment of any sums that may be due the respective parties." There is no suggestion in the record that plaintiff owed any sum to the Company when, by his letter of August 24, 1960, he gave "Official Notice that I am electing to exercise my option, as provided in Part *111*, paragraph 6, in the cancellation of my General Agents Contract, dated April 25, 1956." We are of the opinion, and so hold, that plaintiff thereby terminated the contract as he had a right to do. With the contract thus termi-

nated by plaintiff, Niman's subsequent letter of August 26 could not have worked a termination by the Company under Part III, paragraph 5, for the obvious reason that a contract already lawfully terminated cannot be terminated again.

■ It is true that, as the Company's counsel emphasize, payment of renewal commissions to an agent usually contemplates and is associated with continuance of the agency, thus furnishing an incentive for the agent to maintain and service, as well as to solicit and procure, the business. King v. Raleigh, 100 Mo.App. 1, 7, 70 S.W. 251, 253. And we recognize and reiterate the firmly-established limitation that an agent is not entitled to commissions on renewal premiums paid after termination of his agency, unless his right to receive such commissions is expressly stipulated in or is clearly to be gathered from his agency contract. Christensen v. Prudential Ins. Co. of America, Mo.App., 204 S.W.2d 459, 462; Phillips v. American Nat. Assur. Co., 227 Mo.App. 1136, 1138, 58 S.W.2d 814, 815(1); Locher v. New York Life Ins. Co., 200 Mo.App. 659, 673, 208 S.W. 862, 866(2).

In most of the reported cases in this jurisdiction, the contract under consideration plainly provided or clearly indicated that the agent's right to receive commissions on renewal premiums would cease upon termination of the agency. Arensmeyer v. Metropolitan Life Ins. Co., 254 Mo. 363, 370–372, 375–376, 162 S.W. 261, 263, 264(1); Christensen, supra, 204 S.W. 2d loc. cit. 460, 462–463(2); Locher, supra, 200 Mo.App. loc. cit. 665, 676–677, 208 S.W. loc. cit. 863, 867–868; King, supra, 100 Mo.App. loc. cit. 4, 70 S.W. loc. cit. 252. And there are numerous cases in other jurisdictions involving agency contracts of that tenor and effect. E. g., Stagg v. Connecticut Mut. Life Ins. Co., 10 Wall. 589, 19 L.Ed. 1038; Butler v. New York Life Ins. Co., 45 Wash. 141, 87 P. 1119; Jacobson v. Connecticut Mut. Life Ins. Co., 61 Minn. 330, 63 N.W. 740; Fidelity & Deposit Co. of Md. v. Washington Life Ins. Co. of New York, D.C.Md., 193 F. 512, 513, and cases there collected. In fact, as the Supreme Court of Minnesota quite recently observed, "[o]rdinarily (after termination of his agency) the agent is denied renewal commissions *by the express terms of his contract."* Ramseth v. City Agency, Inc., 264 Minn. 147, 118 N.W.2d 219, 222.

■ But, whether so stated specifically or not, it is implicit in all of the holdings that an agent's "right to commissions on renewals depends entirely upon the terms of the contract existing between himself and the company * * *" Christensen, supra, 204 S.W.2d loc. cit. 462. See 44 C.J. S., Insurance, § 162c, p. 843; 29 Am.Jur., Insurance, § 176, p. 571; annotation 79 A.L. R. 475; annotation 136 A.L.R. 160. And, where the agent has a right to such commissions under the contract, the courts should not be, and have not been, hesitant in recognizing and enforcing that right. Phillips v. American Nat. Assur. Co., 227 Mo.App. 1136; 58 S.W.2d 814; Mutual Ben. Health & Acc. Ass'n. v. LeMaster, 89 Ga.App. 870, 81 S.E.2d 484; Hale v. Brooklyn Life Ins. Co., 120 N.Y. 294, 24 N.E. 317.

■ Returning to the contract under consideration, we observe that the Company's agreement in Part II, paragraph 3, was that, "in accordance with the provisions of this contract, provided the General Agent has been continuously representing the Company for more than one year, renewal commissions, as herein specified, will be paid during his lifetime." The sole contractual limitation upon the obligation of the Company to pay "renewal commissions * * * during his lifetime" was the proviso that "the General Agent has been continuously representing the Company for more than one year," and plaintiff's right to renewal commissions was *not* conditioned upon his continuing faithful performance of his agreement in Part I, paragraph 1, "to produce a minimum of 5 applications each calendar month."

The *only* provision in the contract for termination of the Company's obligation to pay renewal commissions during plaintiff's lifetime was that contained in Part III, paragraph 5: "If the Agent shall at any time * * * violate any of the agreements herein contained, * * * the Company *may, at its option, terminate* this contract by giving five days' notice in writing to the Agent, which action shall release the Company from all liability hereunder, and all commissions or other compensation accrued at the time (of) such termination, or thereafter to accrue, shall be forfeited to the Company as liquidated damages * * *" Assuming (as we have) the validity of the quoted provision, plaintiff's failure to meet his "quota production" would have been *a cause for which the Company might, at its option, have terminated the contract by giving five days' notice in writing;* but, as the contract plainly stated, it would have been the Company's "action" in exercising its option to terminate by written notice, *not* plaintiff's failure to meet his "quota production," which would have released the Company from further liability and would have "forfeited" plaintiff's commissions, accrued and accruing. In other words, the contract under consideration was *not* one in which the parties agreed that plaintiff's violation of a covenant would, automatically and without notice to him, terminate the contract and his right to receive renewal commissions [contrast Boyd v. American Nat. Ins. Co., 20 Tenn.App. 631, 103 S.W.2d 338, 339; Pankey v. Federal Life Ins. Co., 287 Ill.App. 132, 4 N.E.2d 642, 643]; and nothing in the contract suggests that defendant's obligation to pay renewal premiums was a will-o'-the-wisp duty vanishing in those months in which plaintiff might not meet his "quota production." For that matter, the Company actually continued regular monthly remittances for renewal commissions on all premiums paid through the month of June 1960, notwithstanding the fact that plaintiff had not produced as many as five applications in February 1960 or in any month thereafter.

In the final analysis, the Company's defense in this action is simply that, by the aforesaid "chain of events" beginning with Niman's oral statements when plaintiff called him on August 24, 1960, the Company terminated the contract pursuant to Part III, paragraph 5, and thereby was released from liability for payment of renewal commissions. But, as we have seen, the termination was by plaintiff under Part III, paragraph 6, which accorded to him the right to terminate at any time *without penalty.* The reason which prompted his exercise of that right was immaterial, where fraud vitiating that action was neither pleaded nor proved. Christensen, *supra,* 204 S.W.2d loc. cit. 463; Otto v. Imperial Cas. and Ind. Co., 8 Cir., 277 F.2d 889, 893–894(6). See also Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co., 111 Vt. 502, 18 A.2d 164, 168.

In actions of this character, the shoe usually has pinched the other foot in that, as we have noted, agency contracts frequently provide for payment of renewal commissions *only during continuance of the agency.* In such cases, courts have answered *agents'* pleas of hardship by pointing out in each instance that, if the contract was harsh, it nevertheless was one which the parties had a legal right to make and did make, and that the court could not disregard the language employed by the parties and rewrite the contract in accordance with the court's notion of what might be fair and equitable. King, *supra,* 100 Mo.App. loc. cit. 7, 70 S.W. loc. cit. 253; Christensen, *supra,* 204 S.W.2d loc. cit. 464(5); Arensmeyer, *supra,* 254 Mo. loc. cit. 380, 162 S.W. loc. cit. 266; Boyd v. American Nat. Ins. Co., 20 Tenn.App. 631, 103 S.W.2d 338, 346; Bryant v. Continental Cas. Co., 58 Ga.App. 518, 199 S.E. 343, 349. In this action at law, it would seem to be appropriate to make similar response to the Company's suggestion that we should sit "in the nature of a court of equity" and should not permit plaintiff by his termination of the contract under Part III, paragraph 6, to deny to the Company the right to exercise its option to terminate under Part III, paragraph 5.

*If* the parties had intended and agreed that plaintiff should have no right to renewal commissions upon *his* termination of the agency, it would have been a simple matter for the Company, which prepared the contract, so to have provided. In the absence of any such provision, the parties must be held to have meant what they said. Fabian v. Provident Life & Acc. Ins. Co., D.C.Minn., 5 F.Supp. 806, 808. Accordingly, we conclude that the trial court erred in denying plaintiff's right to recover renewal commissions on premiums paid during the period in suit, i e., from July 1960 to January 1961 inclusive.

Plaintiff propounded interrogatories to defendant which elicited, concerning each policy issued pursuant to plaintiff's solicitation and not lapsed prior to termination of the contract, specific information as to (a) the date of issuance, (b) whether the policy was still in effect on July 24, 1962 (the date on which defendant answered interrogatories), and (c) if not then in force, the last effective date of the policy. Using this information (admitted in evidence), plaintiff made a detailed compilation which showed that the renewal commissions allegedly due him on premiums paid during the period in suit were in the aggregate principal amount of $1,225.88. Plaintiff's compilation was received in evidence subject to the sole reservation (as stated by one of defendant's attorneys) that "when I get back to Kansas City I will check it further and I would like to reserve the right to call the court's attention to any miscalculations —I imagine it would be negligible." (The same attorney previously had commented that "we estimate it, without making calculations, that there is a thousand or twelve hundred dollars involved.") The aforesaid evidence as to damages is the only evidence on this issue contained in the transcript on appeal, which bears the written approval of counsel for both parties. However, defendant's counsel state in their brief that they submitted to the trial judge "Exhibit E showing a substantially lesser amount of premiums collected on policies for which plaintiff claims renewal commissions," that "through some *misadvertence*" the transcript makes no reference to this "exhibit," and that defendant now "is in disagreement with plaintiff regarding the amount of renewal commissions that would be due him if there were liability on the contract."

But it is a trite commonplace of appellate procedure that we must take a record as it comes to us [Bennett v. Wood, Mo., 239 S.W.2d 325, 327(2); Prentice v. Williams, Mo.App., 324 S.W.2d 466, 469(2)] and that it may not be pieced out or supplemented by extraneous material not found in the transcript and not conceded by adversary counsel. City of Rolla v. Riden, Mo.App., 349 S.W.2d 255, 257(4). And we are reminded of the no less familiar procedural truism that our system of jurisprudence neither contemplates nor permits appellate determination of what was done in the trial court on the basis of statements in a brief, which find no support in the transcript and are not admitted by opposing counsel. Lubrication Engineers, Inc. v. Parkinson, Mo.App., 341 S.W.2d 876, 879(9), and cases collected in footnote 13. Since the only evidence on damages included in the approved transcript adequately reveals and clearly establishes the aggregate amount of renewal commissions owing to plaintiff on premiums paid during the period in suit, i. e., during the months of July 1960 to January 1961, inclusive, it becomes our plain duty to "dispose finally of the case on appeal." Rule 83.13(c), V.A.M.R.

Therefore, the judgment for defendant is set aside and the cause is remanded with directions to enter judgment for plaintiff (a) in the principal sum of $1,225.88, (b) for simple interest thereon at six per cent (6%) per annum from and after February 27, 1961, the date of institution of suit, and (c) for costs, all in accordance with the prayer of plaintiff's petition.

RUARK, P. J., and HOGAN, J., concur.

On Motions for Rehearing or to Transfer

PER CURIAM.

The only case cited in defendant's motions for rehearing or to transfer is Zumwinkel v. Leggett, Mo., 345 S.W.2d 89. However, defendant's counsel overlook the basic differentiating fact that, as is frequently true, the contract under consideration in Zumwinkel, supra, clearly indicated that the agent's right to receive commissions on renewal premiums would cease upon termination of the agency, i. e., " ' * * * the Company will allow * * * commissions on first premiums and on renewal premiums paid in cash to and accepted by the Company while the agent is authorized to solicit applications to the Company * * *.' " [345 S.W.2d loc. cit. 90] We were cognizant of Zumwinkel, supra, while our opinion in this case was in the course of preparation, but we did not then, and do not now, regard it as authority supporting instant defendant's position. After careful reconsideration of the case in the light of defendant's motions, we remain of the view that our opinion properly disposed of the appeal. Accordingly, defendant's motions for rehearing or to transfer are overruled.