**Henrietta F. ZUMWINKEL, Executrix of the Estate of Edwin F. Zumwinkel, deceased, Respondent,**

v.

**C. Lawrence LEGGETT, Superintendent of Insurance of the State of Missouri, Appellant.**

No. 48143.

Supreme Court of Missouri,

Division No. 1.

April 10, 1961.

D. Jeff. Lance, Cook, Murphy, Lance & English, St. Louis, for appellant.

Ernest L. Keathley, St. Louis, for respondent.

HOLMAN, Commissioner.

This action was instituted by Edwin F. Zumwinkel in an effort to recover from Security National Life Insurance Company an amount alleged to be due him for renewal commissions on certain premiums paid after said plaintiff had been discharged as a general agent for said company. Recovery was also sought for certain office rental paid by plaintiff in the sum of $920. On June 3, 1958, by order of the Circuit Court of Cole County, Missouri, the assets and affairs of defendant were taken over by C. Lawrence Leggett, Superintendent of Insurance of the State of Missouri, and he has subsequently been substituted as defendant herein. Also, shortly before the entry of the final judgment herein plaintiff died and the cause was ordered revived in the name of the executrix of his estate. A trial before the court (and a referee) resulted in a judgment for plaintiff in the sum of $64,568.96, said amount representing renewal commissions in the sum of $63,-648.96 and the rental item of $920 hereto-fore mentioned. Defendant has duly appealed.

For convenience we will continue to refer to Mr. Zumwinkel as plaintiff and to the insurance company as defendant.

At a pretrial conference it was ordered that "a separate trial is to be held on the issue of liability, and in the event that liability is determined to be in favor of the plaintiff, a further proceedings or trial will be held for the purpose of determining the amount of that liability either by the court or some other appropriate method."

By a written agreement dated November 9, 1949, plaintiff was appointed a general agent for the defendant insurance company to act in soliciting applications for accident and health insurance in St. Louis and vicinity. The principal controversy in this case relates to plaintiff's right to have received payment of certain renewal commissions. The applicable portion of the contract relating to renewal commissions is as follows:

"10. The agent shall pay all expenses incurred by him in the performance of this contract. Subject to all of the conditions herein, the Company will allow, and the agent will accept as the agent's full compensation hereunder, commissions on first premiums and on renewal premiums paid in cash to and accepted by the Company while the agent is authorized to solicit applications to the Company for accident and health insurance, as follows: Commission Schedule, 100% Policy Fee, 100% First Month Premium. Renewal Commission, 25% of each renewal premium after the first month. * * * Before the agent shall be entitled to renewal commissions for any particular month, he must submit at least 100 acceptable and paid-for applications during such month."

At the time of the contract the main office of the defendant was located at 4225 Hampton Avenue in St. Louis. Although under the contract plaintiff was required to pay all expenses incurred in the perform-

ance of his contract the defendant provided him with office space in its main office for which no charge was made. Plaintiff moved into those quarters and began building up a sales organization. Under the contract he was authorized to appoint sub-agents to work under his direction, and throughout the time he worked as a general agent for the defendant he had four such subagents. He also employed a secretary and a number of girls who worked in the office as telephone solicitors. The salaries of plaintiff's secretary and the telephone solicitors, and the charges for the telephones, as well as a $300-a-month drawing account for plaintiff, were all paid by the defendant but were charged to plaintiff's commission account.

In 1952 the defendant opened a downtown office in the Carleton Building and plaintiff moved his organization into space provided by the defendant in that office. In the fall of 1953 plaintiff received a letter from Mr. Vaughn Moore, president of the defendant company, advising that the company needed the space occupied by plaintiff in the Carleton Building and plaintiff was directed to move to some other location. As a result of that letter plaintiff leased office space in his own name in the Cotton Belt Building and moved his organization there. Plaintiff paid the rental of $115 a month on that office for eight months and it is that rent which forms the basis of his claim for reimbursement heretofore referred to.

The contract heretofore referred to contained the following provision:

"15. In the event that said agent fails to satisfactorily account for any moneys due the Company, or shall fail to comply with any of the obligations of this contract, same may be terminated by the Company at once, and either party may terminate this contract by giving thirty (30) days written notice to the other party."

On April 28, 1954, a letter signed by Vaughn Moore as president of the defend-ant company was delivered to plaintiff. The body of that letter read as follows:

"This is to advise that your authority to write insurance for Security National Life Insurance Company is hereby terminated and you are directed to forthwith discontinue acting for or on behalf of said company. We herewith request an immediate accounting to the company setting forth in detail all assets and property of the company which are held by you. We request you deliver such assets together with cards and files within five (5) days upon receipt of this letter."

While that letter does not appear to have complied with the contract provision as to notice, plaintiff accepted the notice and immediately ceased to act as agent for defendant.

During the 54 months plaintiff acted as general agent for the defendant he procured 7,229 applications for insurance. While this averaged considerably more than the minimum renewal commission requirement of 100 applications per month, there were several months wherein the number of applications fell below 100. However, it is conceded by plaintiff that all renewal commissions were paid to him from November 9, 1949 to May 1, 1954, which latter date was shortly after he had been discharged as defendant's agent. While there was not shown to be any official action by the board of directors, Mr. Moore permitted plaintiff to be designated during the period of his agency by various titles. He was referred to as manager, vice-president, and as agency vice-president. He had a metal name plate on his door which designated that he was vice-president. However, regardless of these titles, plaintiff concedes that his duties never changed and his compensation was not affected. Plaintiff considered that he had been given the title of vice-president as a reward for the services he had rendered to the defendant.

The person who appeared to be in complete control of the defendant was its pres-

ident, Vaughn Moore. Mr. Moore lived in Aurora, Illinois (and later in Des Moines, Iowa), and was interested in seven different insurance companies. He testified that he devoted about 25% of his time to the defendant company. Plaintiff stated that during the first two years he was with the company Mr. Moore would come to the main office about once a month, but during the last two years he came only about three times a year. However, plaintiff testified that he also saw Mr. Moore at various sales meetings during that period of time.

As has been heretofore indicated the main controversy in this case concerns the question as to whether plaintiff was entitled to receive renewal commissions from May 1, 1954 until the company ceased its operations on June 3, 1958. The contract provides that he is to receive renewal commissions upon premiums paid "while the agent is authorized to solicit applications." Plaintiff makes no contention that he is entitled to the renewal commissions under the terms of the written contract. In his second amended petition he alleged that the "written agreement was amended and supplemented by acts of plaintiff and defendant and by dealings between plaintiff and defendant over a long period of time, whereby it became and was agreed by and between plaintiff and defendant that plaintiff would be entitled to his renewal commissions even though he did not submit 100 acceptable applications during a particular month; and that on policies written by plaintiff for defendant, defendant would continue to pay to plaintiff and plaintiff would be entitled to receive from defendant, commissions on all renewal policy premiums paid on insurance policies obtained for defendant by or on account of plaintiff's efforts on behalf of defendant."

As will hereinafter more fully appear the trial court made no finding that the agreement had been amended by acts and dealings between plaintiff and defendant but based its judgment upon the finding that the contract had been "amended orally by the parties." In his brief here plaintiff contends that the written agreement was "subsequently modified orally and by the acts and conduct of the parties."

The evidence primarily relied upon by plaintiff to show a modification consists of certain statements made by Vaughn Moore at various meetings attended by defendant's agents and prospective agents. There were a number of such meetings in Kansas City, the first being in the spring of 1950. Another meeting was held in Springfield, Missouri, about three months later. In the fall of 1952, a meeting of agents was held at Lake Geneva, Wisconsin, and at another time there was a meeting at Lake of the Ozarks. Also, in 1950, there was a meeting of the company's home office force at Musial's Restaurant in St. Louis. The statements attributed to Mr. Moore were substantially the same at all of those meetings. Plaintiff attended those meetings and would make a speech to the persons present upon the subject of selling insurance. Mr. Moore would introduce him. It was in the course of these introductions of plaintiff that Mr. Moore made the statements concerning plaintiff's contract with the company. The statement made by Mr. Moore at one of the Kansas City meetings is illustrative of what was said at each of the meetings. Plaintiff was asked by his counsel, "What, if anything, did Mr. Vaughn Moore say to you or in your presence, as president of the defendant company, with regard to the matter of your renewal premium commissions?" Plaintiff's answer was, "He said, 'Zumwinkel has a contract with me that provides he will get commissions on any policies that he puts on the books as long as they stay on the books, and should he die his beneficiary would receive the commissions.' "

Plaintiff testified that there were usually some new agents or prospective agents at each meeting and that Mr. Moore would make the statement concerning plaintiff's commissions because he wanted to impress these people with the fact that plaintiff "had a good deal" with the company.

In regard to the amendment or modification of the contract plaintiff testified that it was never amended in writing. In one instance he stated that is was amended orally. However, a little later in his cross-examination plaintiff stated that it was not amended orally, as appears by the following:

"Q. Was the contract ever amended with regard to renewal commissions? A. I would say—

"Mr. Keathley: I think the witness would testify there was no other written document, that's already been answered.

"The Court: That's right, he has also testified it was amended by oral agreement. A. It wasn't amended by oral agreement.

"Q. Was not amended with regard to renewal commissions? A. No."

Plaintiff also testified that the first time Mr. Moore made the statement that he would receive renewal commissions as long as the policies remained on the books was at a "pep meeting" in plaintiff's office attended by plaintiff's subagents. He said Mr. Moore "just walked out of his office and came into my office" and made the statement in addressing the agents present. Plaintiff was then asked (on cross-examination) whether after that meeting he considered that his "contract was amended at that time" and he answered, "I wouldn't say so, not at that time."

Curtis Whiteside, one of defendant's subagents, corroborated plaintiff's testimony concerning Mr. Moore's statement at the meetings held in Kansas City, at Lake Geneva, Lake of the Ozarks, and Musial's. His secretary, Miss Fahr, corroborated plaintiff as to the statement at Musial's. Willard Klunk and Thaddius B. Zumwinkel (subagents) corroborated plaintiff's testimony as to Mr. Moore's statements at Musial's, Lake of the Ozarks, and Lake Geneva.

Vaughn Moore testified that he never discussed the provisions in the contract relating to renewal commissions with Mr. Zumwinkel after the contract was executed. In that regard, however, he did testify that when he agreed to open the office in the Carleton Building the provision in the contract requiring 100 applications per month was changed to 400 applications a month. The witness denied any recollection of having made the statements attributed to him at the various meetings of agents heretofore mentioned. In regard to payment of rent, Mr. Moore testified that he agreed to pay the rental on the office in the Carleton Building upon the basis of plaintiff's agency procuring 400 applications a month, but that he never had any discussion with plaintiff in regard to payment of the rent on the office in the Cotton Belt Building.

Other evidence will be stated in the course of the opinion.

Upon the separate trial of the issue concerning liability the trial court found that the contract had been amended orally by the parties in various particulars, including the following: "2. Plaintiff was to receive free rent in the Cotton Belt Building. 3. The renewal commissions due plaintiff were to be paid as long as the policies remained on the defendant's books." The court accordingly found that "the defendant is liable to plaintiff under the modified contract for rental in the Cotton Belt Building paid by plaintiff for defendant and for renewal commissions due plaintiff after May 1, 1954."

The question concerning the amount due plaintiff was referred to a referee, Honorable Fred J. Hoffmeister, who held a hearing and filed a report showing a finding to the effect that plaintiff was entitled to renewal commissions in the amount of $63,-648.96, and entitled to recover the sum of $920 paid as rent for the office in the Cotton Belt Building. The court thereafter approved the report of the referee and entered a judgment for plaintiff for the total amount found by the referee to be due.

"It is entirely competent for the parties to a contract to modify or waive their rights under it and ingraft new terms upon it.

The parties to a contract ordinarily are as free to change it after making it as they were to make it in the first instance, notwithstanding provisions in it designed to hamper such freedom. For instance, the time fixed for performance or payment may be enlarged by subsequent agreement. A subordinate and separable part of the contract may be waived or modified by the parties without a cancelation or avoidance of the whole contract. To be effective as a modification, the new agreement must possess all the elements necessary to form a contract." 12 Am.Jur., Contracts, § 427, pp. 1004, 1005. Defendant does not question the fact that a written contract may be amended by the subsequent oral agreement of the parties. It contends, however, that the evidence does not warrant a finding that the instant contract was amended so as to provide for the payment of post-discharge renewal commissions. Plaintiff, on the other hand, contends that substantial evidence was adduced to support a finding that, in regard to the payment of renewal commissions, the contract was amended by subsequent oral agreement and by the acts and conduct of the parties. In that connection plaintiff points to Section 510.310 RSMo 1959, V.A.M.S., wherein it is provided that in cases tried without a jury the appellate court shall not set aside the judgment "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

After fully reviewing all of the evidence we have concluded that plaintiff failed to sustain his burden of proving a modification of the contract so as to provide for payment of post-discharge renewal commissions. As we view the case the question as to the credibility of the witnesses is not an important factor herein. We have reached the conclusion indicated notwithstanding the fact that we believe the testimony concerning the statements made by Mr. Moore at the various agents' meetings. Those statements, standing alone, do not constitute a modification. At most, they were evidence that at some prior time the contract had been modified. It should be noted that in each instance Mr. Moore started out with the statement, "Zumwinkel has a contract with me." That statement indicates that the contract was already in existence. But Moore testified that he never discussed the matter or renewal commissions with plaintiff after the written contract was executed. Therefore, in making the statements in question, he was either mistaken as to the provision in the written contract or was intentionally making a false statement.

In considering this question we think it is most significant that plaintiff failed to testify to any occasion (after the execution of the written contract) when he discussed with Mr. Moore the question of the payment of renewal commissions and upon which they mutually agreed that he should be paid those commissions after he ceased to be an agent for defendant. It is true that in one instance plaintiff testified that the contract was amended orally but he did not state the subject of the amendment or relate any details concerning the occasion upon which the amendment was made. Moreover, any possible weight that might be given to that testimony would seem to have been destroyed when, a short time later, plaintiff testified specifically that the contract was *not* orally "amended with regard to renewal commissions." It is also significant that plaintiff testified that after the first meeting at which Moore made the statement in regard to renewal commissions he (plaintiff) did not consider that the contract was amended at that time. In that connection we pose the question—If not then, when was it amended? Plaintiff did not indicate by his testimony as to the time or place when he considered the amendment had been accomplished.

We are convinced that any weight that might otherwise have been given to the statements of Mr. Moore was destroyed by the failure of plaintiff (the other contracting party) to testify as to any oral agreement between Moore and himself to the effect that he would receive renewal

commissions as long as the policies remained on the books. If any such agreement had been made plaintiff, as one of the parties, was bound to have known of it and, in supporting his burden of proof, certainly would have related the details of such an agreement at the trial.

As heretofore stated plaintiff also contends that the contract was modified by the acts and conduct of the parties. It appears that a contract may be modified in that manner. In Conrad v. Fisher, 37 Mo.App. 352, 376, the court stated that "it is competent for the parties to a contract to vary its terms by a subsequent course of dealing." But to accomplish a modification in that manner it is said that "the acts which are relied upon to modify a prior contract must be unequivocal in their character. Acts which are ambiguous in their character, and which are consistent either with the continued existence of the original contract, or with a modification thereof, are not sufficient to establish a modification." Vol. 4, Page on the Law of Contracts, § 2458, p. 4357.

In plaintiff's brief the contention that the contract had been modified by acts and conduct is combined with the point that the contract was modified orally and it is difficult to determine just what acts plaintiff relies upon to prove modification. It would appear, however, that plaintiff relies mainly upon certain facts in connection with the introduction of a new hospitalization policy by defendant in January 1953. After that policy had been formulated defendant sent a form letter to many Missouri "Brokers and Surplus Writers" urging, in effect, that they sell that policy to their customers. The letter contained a commission schedule which included "15% renewal after the first payment for the life of the policy." Copies of the material sent to brokers were sent by Mr. Moore to plaintiff for his information.

We do not think the fact that defendant offered to pay brokers a renewal commission for the life of the policy, and communicated that fact to plaintiff, would be a course of conduct sufficient to modify the contract in question. Plaintiff's contract contained the following provision in regard to new policies: "The selling and renewal commission on any new form of policy issued by the Company after the date of this contract shall be at the rate specified in this commission schedule unless the Company shall fix a different rate in which case the commission shall be at the rate fixed by the Company." We think it is apparent that neither plaintiff nor defendant considered that the commission schedule offered to brokers was applicable to plaintiff. This for the reason that plaintiff continued to receive renewal commissions of 25% on all of his policies until he was discharged. Since plaintiff operated a large agency writing hospitalization policies for defendant we think it may reasonably be assumed that his agency procured application for some of the policies in question. As stated, the fact that he continued to receive 25% renewal commissions on all premiums would indicate that there was no modification in the manner suggested. Moreover, a broker comes within a completely different classification than does an agent such as plaintiff. An "insurance broker" is defined as "one who acts as middleman between insured and company, and who solicits insurance from public under no employment from any special company and places order of insurance with company selected by insurer or, in absence of any selection, with company selected by such broker. Broker is agent for insured * *." Black's Law Dictionary, Fourth Edition, p. 945. Under the circumstances, the fact that brokers were offered renewal commissions for the life of the policy would not necessarily indicate that defendant's general agents would be paid according to the same schedule.

We have concluded that the acts and conduct of the parties herein (including the statements made by Moore at the agents' meetings) were not of the type and character which would have been required to modify the instant contract so as to provide

for payment to plaintiff of post-discharge renewal commissions. Since we have held that the provision of the contract specifying that plaintiff would be allowed commissions on renewal premiums paid "while the agent is authorized to solicit applications to the company" has not been modified in either manner suggested by plaintiff, it follows that the trial court erred in finding that defendant was liable to plaintiff for renewal commissions on premiums paid after May 1, 1954.

We will next consider whether plaintiff was entitled to recover for the rent paid for the office in the Cotton Belt Building. The contract provided that "The agent shall pay all expenses incurred by him in the performance of this contract." Nevertheless, the defendant permitted plaintiff to occupy space in its offices on Hampton Avenue and in the Carleton Building and no rent was charged therefor. Plaintiff testified that Moore "agreed to give me free rent under my deal." However, it later developed on his cross-examination that the agreement of Mr. Moore to provide plaintiff "free rent" was made before the written contract was entered into and therefore that testimony cannot properly be considered.

Plaintiff conceded that there was no specific agreement by Mr. Moore to pay the rent in question. We think the fact that plaintiff paid the rent for eight months without requesting that defendant pay it as it became due, or reimburse him each month, strongly indicates that there had been no modification of the written agreement in regard to the rental expense. We do not think the fact that defendant provided plaintiff with rent-free space for a time in its offices would be a sufficient circumstance to warrant a finding that defendant was obligated to pay the rent on offices subsequently occupied by plaintiff in the absence of an agreement by defendant to do so and in the face of the provision of the contract to the contrary.

We accordingly rule that plaintiff was not entitled to recover the amount of rental paid by him for the office in the Cotton Belt Building.

The judgment is reversed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.