Allen **PETERSON** and Ronald Peterson, Respondents,

v.

**CONTINENTAL BOILER WORKS, INC., Appellant.**

No. 71589.

Supreme Court of Missouri, En Banc.

Feb. 13, 1990.

court erred in overruling its motion for judgment notwithstanding the verdict or in the alternative motion for new trial in that: (1) the verdict was not supported by substantial evidence; (2) the verdict for punitive damages was not supported by substantial evidence; and (3) the punitive damage award did not bear a reasonable relationship to the injury. The Court of Appeals, Eastern District, affirmed and transferred the case to this Court because of general interest and importance. We have jurisdiction. Mo. Const. art. V, § 10. Reversed.

## I.

The record reveals the following facts which we view in the light most favorable to the verdict. Allen Peterson was employed at Nooter Corporation in St. Louis for 28 years, until approximately 1973, when Bob Fournie, executive vice president of Continental, hired Allen Peterson to manage Brooks Erection and Construction Corporation (Brooks), a recently acquired subsidiary of Continental. Brooks' primary business was equipment maintenance and overhaul for large plants. Allen Peterson accepted the position and in time was able to acquire 25 percent of Brooks stock. Later Allen Peterson hired his son, Ronald, to help manage Brooks and gave his son half of his stock.

Continental owned seventy-five percent of Brooks stock until the late seventies when Brooks International Corporation (BIC) was formed as a holding company for the subsidiaries of Continental. At that time, the Petersons and Continental transferred their Brooks stock for equivalent shares of BIC stock. The Petersons then each sold 2½ percent of their stock to Continental. Thus, Continental held 80 percent of BIC stock; Allen and Ronald Peterson each held 10 percent of BIC stock.

On December 5, 1983, Allen and Ronald Peterson and Continental entered into a stock restriction agreement regarding the BIC stock. The agreement provided for Continental's purchase of the Petersons' stock in the event their employment was terminated.

Andrew Kasnetz, Warren W. Davis, Gregory H. Wolk, St. Louis, Mo., for appellant.

Jim J. Shoemake, Kenneth J. Barnhouse, Valerie G. Richardson, St. Louis, for respondents.

ROBERTSON, Judge.

Appellant, Continental Boiler Works, Inc. (Continental), appeals from a jury verdict in favor of respondents, Allen Peterson and his son, Ronald Peterson (the Petersons), awarding actual and punitive damages in an action for breach of a stock restriction agreement. Continental alleges the trial

That agreement provides in pertinent part:

> 6. *Severance of Employment.* If at any time, because of death, resignation, removal or for any other cause, neither member of the Peterson Group is employed by Brooks International or one of its subsidiary corporations, Continental shall purchase and the Peterson Group and its family members shall sell all shares of Brooks International they own at *adjusted book value.* The closing of such purchase and sale shall take place at the office of Continental on a mutually agreeable date which shall be not less than ten (10) or more than ninety (90) days after the date when neither of the members of the Peterson Group is employed by Brooks International or one of its subsidiaries. (Emphasis ours).

"Adjusted book value" is defined in the agreement.

> B. The term "adjusted book value" as used in this Agreement shall mean book value (computed in accordance with sound accounting practices consistently applied) increased by an amount equal to the excess of the *fair market value* of the tools, furniture, vehicles, machinery, equipment, real property and improvements thereon, and other personal and real property of Brooks International and its subsidiaries on the valuation date over their respective book values, and decreased by [audit fees and related] expenses.... (Emphasis ours).

The agreement provides that the Petersons and Continental would choose a mutually agreeable certified public accounting firm to determine the "adjusted book value" of BIC's stock and that firm would be given "broad discretion to hire independent appraisers for the purpose of determining the fair market value" of the property identified in the stock restriction agreement. According to the contract, the decision of the CPA firm as to the appraisal firms would be final.

On February 7, 1984, Continental terminated both Allen and Ronald Peterson from employment with Brooks. Eventually, Arthur Young and Company (Arthur Young), a CPA firm, was chosen by Petersons and Continental to determine the adjusted book value of BIC stock. Subsequently, Arthur Young recommended National Industrial Service, Inc. (NISI) to perform the appraisal of BIC's assets, after Continental rejected other appraisal firms proffered by Arthur Young. NISI is a St. Louis-based auctioneering and appraisal firm.

On July 6, 1984, NISI submitted its written appraisal to Arthur Young showing a total value of all items appraised at $2,417,979.00. Thereafter, on September 11, 1984, Arthur Young submitted its calculated adjusted book value of BIC stock as of January 31, 1984, the relevant valuation date, at $3,341,787.00. However, Arthur Young set forth two conditions precedent to finalizing its audit report: (1) receipt of an audit financial statement of BIC for the year ended December 31, 1983; and (2) signed representation letters from the Petersons and the management of Continental.

Subsequently, the representation letters were provided by the Petersons and Continental. Continental did not submit its 1983 audit financial statement of BIC to Arthur Young. Thus, a final report has not been issued and the stock purchase has not been completed. However, Arthur Young did submit a draft balance sheet as a result of its audit and a letter setting out the adjusted book value of BIC as of January 31, 1984, including NISI's appraisal.

The Petersons filed an action against Continental and subsequently filed a five-count, second amended petition against Continental alleging breach of contract, breach of fiduciary duty by Continental, breach of fiduciary duty by the officers of Continental, intentional interference with the business expectations of the Petersons by the officers of Continental and seeking specific performance of the contract. Continental counterclaimed, requesting a declaration of rights under the agreement and alleging that the appraisal was not made on a fair market value basis as required by the stock restriction agreement. The case was submitted to the jury on the breach of contract claim. The jury returned a verdict in favor of Petersons in a total amount of

$811,757.40; $668,357.40 of this amount represents 20 percent of BIC's adjusted book value as of January 31, 1984, and Petersons were awarded 9 percent interest per year from October 22, 1983, on this amount. The remaining $143,400.00 represents 20 percent of other assets, i.e., litigation claims, settled in favor of BIC. Additionally, Petersons were awarded punitive damages in the sum of $250,000.00.

## II.

In its first point on appeal, Continental alleges that the trial court erred in overruling its motion for JNOV or the alternative motion for a new trial. Continental claims that the verdict is not supported by sufficient, substantial or competent evidence from which a jury could find that the assets of BIC were to be appraised under an ongoing business valuation. Essentially, Continental argues that there was not sufficient evidence to support the submission of Instruction Number 6, the verdict director. Further, Continental argues that the Petersons did not plead or prove an oral modification of the stock restriction agreement and thus should not have been allowed to submit the instruction to the jury.

Instruction 6 reads as follows:

Your verdict must be for Plaintiffs Allen and Ronald A. Peterson if you believe:

First, plaintiffs and defendant agreed that National Industrial Services, Inc. would be allowed to appraise the fair market value of the assets of Brooks International Corporation under the Stock Restriction Agreement utilizing an ongoing business valuation methodology, and

Second, plaintiffs performed their obligations under the Stock Restriction Agreement, and

Third, Arthur Young was prevented from completing this valuation process as required under the Stock Restriction Agreement by the conduct of defendant, and

Fourth, defendant failed to perform its obligations under the Stock Restriction Agreement, and

Fifth, plaintiffs were thereby damaged.

In Count I of their second amended petition, the Petersons alleged that Continental breached its contractual obligation under the terms of the stock restriction agreement by, among other things, its refusal to accept Arthur Young's adjusted book value of BIC stock which was based on NISI's valuation of the assets of BIC. Further, the Petersons pleaded that NISI appraised the assets at a fair market value pursuant to the stock restriction agreement.

At trial, the Petersons contended that "fair market value" was not defined in the agreement but, prior to the acceptance of NISI as the appraiser of the assets, Petersons and Continental agreed that NISI would determine the fair market value on an ongoing business basis.

Following the Petersons' termination in February, 1984, negotiations began between the Petersons and Continental to choose a mutually agreeable CPA firm to begin the process of appraising BIC's assets. Arthur Young was chosen by both Petersons and Continental and recommended NISI as an independent appraisal firm after Continental rejected other recommendations.

Stuart Millner, president of NISI, testified that Arthur Young arranged meetings held in March, 1984, with the Petersons and Continental to familiarize them with NISI and the method it would be using for appraising BIC's assets. He testified that what was primarily discussed at these meetings was NISI's understanding of how the assets were to be appraised. Millner also testified that at the meetings and in his acceptance letter dated March 24, 1984, he explained that the fair market value of a business differs according to the status of a business—whether the business is liquidated or a going concern. If the business is a going concern, the fair market value will be higher than the fair market value of a liquidated business.

Millner testified that NISI was told by Arthur Young and at the meetings that BIC was alive and well and operating. It was not to be a company that was to be liquidated. Therefore, assets to be appraised were to be appraised on that basis, as a company that was still operating. He further testified that "Arthur Young in their engagement letter [dated March 26, 1984] stated that we would be making the appraisal on a fair market basis. When this appraisal came out it said ongoing business. Between the time that we were engaged and the time this appraisal came out those words became synonymous."

Stuart Millner defined fair market value as "assets that are being appraised ... where the buyer and seller are under no duress to either sell or buy." However, he went on to testify that here, "[T]hat is the same classic definition of fair market value of the assets we're dealing with on an ongoing business basis."

Furthermore, Stuart Millner's testimony indicated that both Petersons and Continental were made aware, prior to NISI's engagement, of how NISI was going to appraise the assets. Jack Knowlan, attorney for Petersons during the negotiations, testified that, "[It] was clear to me and clear to everyone at the meeting what Stuart Millner was proposing that the fair market value be determined by viewing Brooks [International Corporation] as an ongoing business."

Two questions are inherent in Continental's assertion that the trial court erred in submitting Instruction 6. The first is whether the phrase "fair market value" is ambiguous. The second is whether evidence of the discussions at the initial meeting between NISI, Continental and the Petersons constitute a modification of the contract.

### A.

■ "Fair market value", though not defined in the contract, is a phrase without ambiguity in the law. It means "the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so." *Carter v. Matthey Laundry & Dry Cleaning Co.*, 350 S.W.2d 786, 794 (Mo.1961). See also MAI 16.02 (3rd. ed. 1981). Fair market value is not determined by value to the owner alone; it is measured also by the price that one who wishes, but does not need to buy, will pay.

The Petersons agree. Their brief, with refreshing candor, indicates that the term " 'fair market value' may not be ambiguous...." Nevertheless, they find an ambiguity in that Continental construes the contractual language differently than do they. Their brief recites, "the evidence showed that an ambiguity existed at the time of performance by the appraiser as to what methodology he would use to determine the fair market value of BIC's assets."

The "ambiguity" on which the Petersons pin their hopes is thus not the product of the contractual language; it results from NISI's assumption that Continental and the Petersons intend for the phrase "fair market value" to mean "on-going business value." The following colloquy between Stuart Millner, NISI's president and the Petersons' witness and Mr. Kalinowski, counsel for Continental, on cross examination illustrates the point.

Q. [by Mr. Kalinowski]. Do you agree that there are three basic methods for valuing assets: on-going business, fair market value, and liquidation and auction value?

A. [by Mr. Millner]. I agree with that statement if the definitions are that clear to begin with, yes.

Q. That's a true statement that I just made?

A. That is a true statement.

Q. Your definition of an on-going business value is what?

A. Well, an on-going business value is the value that the assets have to the company. In my business they have value to the company as long as it's an alive and well company, running.

Q. And your definition of fair market value is what, sir?

A. As I defined before, fair market value has to do with value between a seller and buyer under no duress to sell those assets or buy them.

Q. And that's different than a value to the company, isn't that right?

A. The value to the company?

Q. Yes, sir.

A. I'm sorry, I don't understand the question.

Q. Fair market value is different than on-going business value as far as value to the company?

A. That's true unless they come together in the engagement as it did in this case.

Mr. Millner makes clear, however, that on-going business value is higher than fair market value in response to a question by the trial court.

[T]he appraisal business is not a science.... We have a value that we know for liquidation of three hundred dollars or three-fifty; on fair market value ten or fifteen, twenty percent more, four hundred dollars, four-fifty if they are not forced to sell it on a liquidation basis. We believe they can get far more for it on an on-going business basis. The new cost would be nine hundred, a thousand dollars. Therefore, there would be some value a little bit less—not just a little bit less, less value than new, greater than fair market. It's in operation. It's ready to do the job.

The stock restriction agreement does not call for an appraisal of the value of BIC, or an appraisal of the value of BIC's property to BIC, as the Petersons claim. Instead, it calls for a fair market value appraisal of the property of BIC. The fair market value of the property together with the book value of BIC as determined by "sound accounting practices consistently applied" provides the adjusted book value of BIC and determines the amount to be paid the Petersons.

The applicable rules of law are set out in *Kalen v. Steele*, 341 S.W.2d 343, 346 (Mo. App.1960), and quoted with approval in *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973):

The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention. Where there is no ambiguity in the contract the intention of the parties is to be gathered from it and it alone, and it becomes the duty of the court and not the jury to state its clear meaning. [citations omitted]. A court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language for there is nothing to construe. [citation omitted]. It is only where the contract is ambiguous and not clear that resort to extrinsic evidence is proper to resolve the ambiguity. [citation omitted].

A contract is not rendered ambiguous by the fact that the parties do not agree upon the proper construction to be given it. [citation omitted]. A contract is ambiguous only when it is reasonably susceptible of different constructions.

Applying these rules, we conclude that evidence of the meeting with NISI cannot be employed to assist in the construction of the contract. The contract is not ambiguous in its use of "fair market value." No additional construction is necessary or permitted.

### B.

■ The Petersons argue in essence, however, that if the contract is not open to interpretation, Continental agreed to an oral modification of the contract at the initial meeting at which NISI explained its appraisal methods. By that agreement, they argue, Continental acceded to an ongoing business valuation of BIC's property. Continental, of course, disagrees.

In *Zumwinkel v. Leggett*, 345 S.W.2d 89 (Mo.1961), an insurance agent, Zumwinkel, attempted to recover renewal commissions on premiums paid after he had been discharged as the general agent of the insurance company. The agreement between the agent and the company provided that the agent would receive renewal commissions "while the agent is authorized to solicit applications." Zumwinkel admitted that he was not entitled to the commissions

under the written agreement, but argued that the written agreement was modified orally by the acts and conduct of the parties. This Court, quoting what is now 17 Am.Jur.2d *Contracts,* § 465 (1964) said, "To be effective as a modification, the new agreement must possess all the elements necessary to form a contract." *Zumwinkel,* 345 S.W.2d at 94. *Accord Smith v. Githens,* 271 S.W.2d 374, 380 (Mo.App. 1954); *Twin River Const. Co. v. Public Water Dist.,* 653 S.W.2d 682, 690 (Mo.App. 1983).

We find nothing in the record to support the formation of a new contract. Continental contends that it did not agree to the valuation method announced by NISI. The record reveals no consideration for Continental agreeing to adopt a valuation different than that to which it agreed in the stock restriction agreement with the Petersons.

Instruction 6 assumes either ambiguity in the contract or a modification of the stock restriction agreement. There is, however, neither an ambiguity in the stock restriction agreement nor the mutual assent and consideration necessary and sufficient to support a modification of that contract. We hold, therefore, that the trial court erred in submitting Instruction 6. The judgment of the trial court is reversed.

### III.

We address the issue of the availability of punitive damages; it will arise on remand. Continental argues that punitive damages are not appropriate in this case; the Petersons obviously hold the contrary view. Although the Court of Appeals did not favor us with its reasons for transferring the case to this Court—beyond recitation of the general interest and importance formula—it appears that the punitive damage issue provides the rationale for transfer to this Court.

Three broad questions are inherent in the punitive damage issue in this case. First, under what circumstances are punitive damages available in a breach of contract action? Second, must the plaintiff specifically plead an exception to the general rule

prohibiting punitive damages in breach of contract actions? Third, does *Burnett v. Griffith,* 769 S.W.2d 780 (Mo. banc 1989), announce new law on punitive damages and, if so, does that law apply retroactively to cases decided prior to that decision, but now on appeal?

In accordance with proper jurisprudential practice, we will decide this case as narrowly as possible. To the extent that all of these questions are not answered here, they obviously remain viable for subsequent decision. In considering the legal questions presented, we recall that the issues here come to this Court following a jury verdict awarding punitive damages; the error assigned is the trial court's failure to sustain Continental's motion for judgment notwithstanding the verdict. Thus, we evaluate all evidence in the light most favorable to the verdict. *Stark v. American Bakeries Co.,* 647 S.W.2d 119, 121 (Mo. banc 1983).

### A.

The general rule is that punitive damages may not be recovered in breach of contract actions. *Williams v. Kansas City Public Service Co.,* 294 S.W.2d 36, 40 (Mo. 1956); *Forinash v. Daugherty,* 697 S.W.2d 294, 306 (Mo.App.1985); *Stamps v. Southwestern Bell Telephone,* 667 S.W.2d 12, 13 (Mo.App.1984).

> Our system, then, is not directed at *compulsion* of *promisors* to *prevent* breach; rather it is aimed at relief to *promisees* to *redress* breach.... Perhaps it is more seemly for a system of free enterprise to promote the use of contract by encouraging promisees to rely on the promises of others, rather than by compelling promisors to perform their promises out of fear that the law will punish their breaches. In any event, this at least adds to the celebrated freedom to make contracts, a considerable freedom to break them as well.

Farnsworth, *Legal Remedies for Breach of Contract,* 70 Colum.L.Rev. 1145, 1147 (1970).

From this general rule, the courts have carved two exceptions. The first is found

where the breaching party's conduct, apart from an intentional breach of the contract, amounts to a separate, independent tort. The second exception permitting recovery of punitive damages is found where the breach of contract is coupled with violations of a fiduciary duty.

### 1.

We consider first the independent tort exception. *Williams*, 294 S.W.2d at 40, announces the exception in Missouri. "There have been recognized a few exceptions to the above rule [prohibiting punitive damages in breach of contact cases generally] where the breach amounts to an independent, willful tort and there are proper allegations of malice, wantonness, or oppression. *See* 15 Am.Jur., Damages, § 273, at p. 709, and 25 C.J.S., Damages, § 120, at page 717." Williams goes on to cite with approval *Holland v. Spartanburg Herald–Journal Co.*, 166 S.C. 454, 165 S.E. 203 (1932), in which the court held that "acts of willfulness would not support an allowance of punitive damages." *Williams*, 294 S.W.2d at 40. This latter view is consistent with a plethora of cases—with which we agree—stating that punitive damages are not available where the basis of the complaint is breach of contract, even where the breach is intentional, willful, wanton or malicious. See, e.g., *Den v. Den*, 222 A.2d 647, 648 (D.C. App.1966); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.App.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 920 (Iowa 1979); *Gonzalez v. Allstate Insurance Co.*, 217 Kan. 262, 535 P.2d 919, 922 (1975); *Griffith v. Shamrock Village*, 94 So.2d 854, 858 (Fla.1957).

### 2.

A second exception permits recovery of punitive damages when the breach of contract is coupled with violations of a fiduciary duty, finding its primary expression in *Brown v. Coates*, 253 F.2d 36 (D.C.Cir. 1958). The court held that a real estate broker's bilking of his client justified the imposition of punitive damages. Where "one trained and experienced holds himself out to the public as worthy to be trusted for hire to perform services for others, and those so invited do place their trust and confidence, and that trust is intentionally and consciously disregarded ... community protection, as well as that of the victim, warrants the imposition of punitive damages." *Id.* at 40. Thus, Judge (later Chief Justice) Burger wrote "where a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and *in disregard of obligations of trust punitive damages may be assessed.*" *Id.* at 39. (Emphasis added).

*Forinash v. Daugherty*, 697 S.W.2d 294 (Mo.App.1985), upon which the Petersons place great reliance, involved the sale of control of a corporation by the majority shareholders without notice to the minority shareholders. Over Judge Prewitt's dissent, the court permitted recovery of punitive damages on the basis of the defendants' breach of their fiduciary duty to minority stockholders.

*Forinash's* analysis is not particularly instructive for our purposes; the majority seems to think that the breach of fiduciary duty exception "carries the rule further...." *Id.* at 307. Quoting Calamari & Perrillo, *Contracts*, § 14–3, p. 521 (2d ed. 1977), *Forinash* recites " '[Punitive damages] are also awarded where the breach also involves the malicious or wanton violation of a fiduciary duty even where the violation does not constitute an independent tort.' "

*Brown* recognizes the exception however, based on the fiduciary's holding himself out to the public as worthy of trust. It is the breach of this "public" trust that gives rise to a potential for punitive damages. *Forinash* extends the exception to cases involving a breach of a fiduciary relationship in a private setting. This Court has not so held.

### B.

■ Against this general background, a second question presents itself: must the

plaintiff expressly plead either or both of these exceptions in order to recover punitive damages in a breach of contract action? On this question, we find a conflict between the districts of the Court of Appeals. In *Stamps v. Southwestern Bell Telephone Co.*, 667 S.W.2d 12, 14 (Mo.App. 1984), the Eastern District wrote: "[I]t would seem the independent tort arising from the breach should be alleged, proved, and the ultimate facts thereof submitted to the jury as a predicate for the award of punitive damages."

*Forinash*, a case from the Southern District, relied on *Garrett v. American Family Mutual Insurance Co.*, 520 S.W.2d 102 (Mo.App.1974), a case applying Kansas law, for the proposition that the plaintiff need not plead an independent tort in order to recover. Instead, the plaintiff need only show that "'the manner in which the breach occurred constitutes a willful tort for which an action for exemplary damages will lie....'" *Forinash*, 697 S.W.2d at 307 (quoting *Garrett*, 520 S.W.2d at 121).

The conflict thus drawn, we believe the better practice is as alluded to in *Williams*, 294 S.W.2d at 40, and clearly stated in *Stamps*, 667 S.W.2d at 14. There must be "proper allegations" (*Williams*); "the independent tort ... should be alleged." (*Stamps*). See also *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278, 281 (1984). ("[T]he plaintiff must specifically plead and prove this cause of action in tort in order to be awarded punitive damages.") The same is true if plaintiff seeks to recover under a breach of fiduciary duty theory; specific pleading is necessary.

### C.

■ Having considered the law generally, we turn now to consider the facts of this case. First, Continental argues that the Petersons failed to allege an independent tort and that punitive damages are precluded by their failure to specifically allege such tort. Our review of the Petersons' petition supports Continental's argument. Even giving the Petersons' petition its broadest intendment, we find no allegations in the petition that Continental's actions constitute an independent tort.

However, the Petersons' petition does specifically plead a cause of action for breach of fiduciary duty in Count III. We must therefore consider whether Count III states a cause of action for breach of fiduciary duty entitling the Petersons to seek punitive damages. If so, they may recover punitive damages.

We recognize that majority shareholders owe a fiduciary duty to minority shareholders. *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351, 358 (Mo.App.1976); *Kirtz v. Grossman*, 463 S.W.2d 541, 544 (Mo.App.1971). In discussing the breach of fiduciary duty exception to the general rule prohibiting punitive damages for breach of contract actions, however, we are mindful that the extension of the exception to private fiduciary relationships accomplished in *Forinash* is both contrary to *Brown* and without the sanction of this Court. We assume, without deciding and for the sake of argument only, that *Forinash* correctly states the law of Missouri.

"The development of fiduciary principles in the corporate field has historically been based upon the proposition that corporate managers owe their primary responsibilities to the owners of the corporation—the shareholders." Ruder, *Duty of Loyalty—A Law Professor's Status Report*, 40 Bus.Law. 1383, 1384 (1985). The duty of loyalty exists to the shareholders by virtue of their status as shareholders, and not as a result of any contractual arrangement. Generally speaking, this "duty of loyalty imposes an obligation on the corporate manager to avoid conflict of interest transactions." *Id.* at 1386. Specifically, Dean Ruder identifies ten substantive areas in which the duty of loyalty is subject to breach:

> [S]elf-dealing, dealings by a corporate parent with its subsidiaries, majority shareholder injury to minority shareholders in corporate acquisition and reorganization transactions, excessive compensation, use of corporate funds to perpetu-

ate control, sale of control at a premium, insider trading, corporate opportunities, competition by corporate officers and directors with their corporation, and fiduciary obligations in bankruptcy.

Id. at 1386–7.

When conducting corporate affairs as dominant shareholders, Continental owes the Petersons the obligations of good faith and fair dealing as shareholders because they are shareholders. In this case, the fiduciary analysis is complicated by the existence of a contract between the majority and minority shareholders establishing, inter alia, a procedure for effectuating a purchase of the minority's stock by the majority. The stock restriction agreement does not destroy Continental's fiduciary duty to the Petersons as shareholders; nor does that agreement create additional fiduciary duties flowing from Continental to the Petersons. The obligations flowing to the Petersons under the agreement are not fiduciary in nature but contractual.

The failure to distinguish between contractual obligations that arise by virtue of the agreement and fiduciary duties that arise as a result of the Petersons status as shareholders permeates the Petersons' analysis of this case. The Petersons do not allege any of the breaches of fiduciary duty to which Dean Ruder refers. Instead their petition avers as follows in relevant part:

> 25. ... Continental was entrusted by the plaintiffs as their agents to act in all respects with the performance of the [stock restriction agreement] with the utmost good faith and fidelity [due to Continental's superior knowledge as the majority shareholder of Brooks].

> 26. The Petersons trusted Continental ... to perform all of the duties called for under [the stock restriction agreement], to be perfectly frank, to make full disclosure of all material facts, to strictly avoid misrepresentation and in all respects, act with the utmost good faith and fidelity with regard to the interests of the Petersons.

\* \* \* \* \* \*

> 29. Defendant has refused to perform its obligations pursuant to the terms of [the stock restriction agreement] maliciously, wantonly and in conscious disregard of plaintiffs' rights....

All of the acts of Continental the Petersons allege as breaches of Continental's fiduciary duty emanate from obligations imposed by the contract, not from a duty owed the Petersons as shareholders.

In order to recover punitive damages under the breach of fiduciary duty exception—again assuming that the exception is properly, extended to private fiduciary duties for the sake of argument—the plaintiff must aver that the duty which he alleges is breached arises from fiduciary responsibilities. The fiduciary duty must exist separately from and independently of contractual obligations.

Under these pleadings, the Petersons failed to state a claim entitling them to punitive damages. They allege wanton and malicious actions in breach of the contract. As we have said, punitive damages are not available for breaches of contract, even where the breach is willful, wanton or malicious. We agree with the holding of the Georgia Supreme Court in *Horne v. Drachman*, 247 Ga. 802, 280 S.E.2d 338, 339 (1981). "Nor can appellee recover punitive damages based upon the corporation's refusal to purchase his stock. 'Exemplary damages can never be allowed in cases arising on contracts.' [citation omitted]. This is true even though the refusal to pay may be in bad faith ..." citing *Nestle Co. v. Ewing & Sons*, 153 Ga.App. 328, 265 S.E.2d 61 (1980).

Moreover, in considering carefully the evidence in this case, and doing so in the light most favorable to the verdict, we conclude that the Petersons failed to plead a breach of a fiduciary duty, independent of Continental's alleged breach of its contractual obligations.

The trial court erred in submitting the issue of punitive damages to the jury.

### D.

Because we find that the Petersons are not entitled to recover punitive damages,

we need not consider issues raised with regard to *Burnett v. Griffith,* 769 S.W.2d 780 (Mo. banc 1989).

### IV.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

BLACKMAR, C.J., HIGGINS, COVINGTON, BILLINGS, JJ. and CLARK, Special Judge, concur.

RENDLEN, J., concurs in result.

HOLSTEIN, J., not participating because not a member of the Court when the case was submitted.