**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 10a0459n.06**

**No. 08-2533**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jul 27, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNIVERSAL ELECTRIC PRODUCTS CO., INC., | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| EMERSON ELECTRIC CO., | ) ) | |
| Defendant-Appellee. | ) ) | |

Before: BOGGS, and COOK, Circuit Judges; and COLLIER, Chief District Judge.[*]

CURTIS L. COLLIER, Chief District Judge. Plaintiff Universal Electric Products Co., Inc. (UEP), a distributor, sued Defendant Emerson Electric Co. (Emerson), a manufacturer, alleging that, by selling directly to UEP's customers, Emerson breached the parties' distributorship agreement and tortiously interfered with UEP's business relationships. The district court granted summary judgment to Emerson, and finding no error in the court's judgment, we AFFIRM.

**I. Relevant Facts**

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

No. 08-2533
*Universal Elec. Prod. Co., Inc. v. Emerson Elec. Co.*

UEP is a distributor of motors and related products to automotive original equipment manufacturers and suppliers (OEMs) throughout the Midwest. Emerson is a manufacturer of electrical products, including motors, gears, and drives. A broad-line distributorship agreement (Agreement) governed UEP and Emerson's business relationship. Under the Agreement's terms, UEP was appointed as a "non-exclusive authorized Distributor" of certain products manufactured and/or sold by Emerson. UEP agreed to "actively and aggressively promote the sale and distribution" of these products and to fulfill all "terms and conditions of sale including payment terms." Emerson reserved the right to "revise the price of Products," and "its terms and conditions of sale." The parties further agreed "any such action shall not form the basis of any claim" by UEP. Either party could terminate the Agreement by giving sixty (60) days' written notice, or, in the event UEP violated the Agreement, Emerson could terminate it immediately with written notice. The Agreement contained an integration clause, which contains language relevant to this litigation:

> This Agreement supersedes and cancels all previous written or verbal quotations, arrangements, understandings, or agreements. Other than as expressly stated herein, nothing in this Agreement shall be construed as granting exclusive distributorship or rights to the Distributor [UEP] in the Market Area or any rights in any other geographical area or preventing [Emerson] from freely operating or appointing other Distributors in the Market Area . . . . The parties agree that (I) nothing in this Agreement or performance of this Agreement by Distributor shall be construed to give Distributor any vested or proprietary rights in the Market Area concerning the Products . . .

- 2 -

Finally, the Agreement provided that it "may not be altered or modified except in writing and duly executed by authorized representatives of both parties." The Agreement remained in effect until Emerson terminated it in November 2006.

Tensions in the parties' business relationship began in 2001 when Emerson made a direct sale to Mann & Hummel, an OEM whose business UEP had cultivated. Jeffrey Beaton, UEP's president and CEO, described this conduct as violating the Agreement by improperly taking advantage of "strategic pricing and customer information that UEP's personnel had conveyed to Emerson and undercut[ting] UEP's ability to operate as Emerson's distributor." In response to UEP's objection, Emerson's Director of Sales, Gary Sajewich, issued a letter crediting UEP with a percentage of the Mann & Hummel order and asking UEP to supply Emerson with a listing of OEMs to which UEP supplied significant Emerson products. Emerson planned to review this list to "assess [its] commitment not to pursue these accounts on a direct basis." UEP never sent the list.

Despite its increased costs, which Emerson passed along to other distributors, UEP continued to receive more favorable pricing than was given to Emerson's other distributors. Around May 2005, Emerson entered discussions with UEP regarding the need to raise prices. It suggested that UEP develop a more profitable end-user business and offered to help UEP transfer its OEM business to another distributor, thereby allowing UEP to sell Emerson products at a higher margin to end-users. In February 2006, Emerson executives advised UEP that prices would increase to the level paid by its other distributors, effective March 20, 2006. Emerson explained that it was not making enough

money on the sales to UEP and that it needed to match the price increases already extended to other distributors. UEP did not accept Emerson's offer to help explain the price increase to UEP's customers and instead sent its own letter to its existing clients. The letter attributed the increase to Emerson's "need to increase profitability rather than maintaining competitive pricing." In response, two of UEP's customers approached Emerson to purchase products directly, complaining that UEP's pricing was "way beyond competitive," and that UEP was pushing Emerson's competitors' products and making it difficult to buy Emerson motors. Emerson sold directly to both companies, sometimes at prices lower than those it offered UEP.

The business relationship continued to deteriorate following the price increases. The parties attempted to negotiate a new distributorship agreement around May 2006, but did not succeed. Emerson sent a letter in November 2006 terminating the Agreement based on UEP's violation, namely "cessation of actively promoting the sale and distribution" of Emerson products, "failure to timely pay for product purchased," and "failure to make payments against the past due receivable balance." UEP responded by filing suit, alleging breach of contract, tortious interference with business relationships, and antitrust violations.[1] Emerson counterclaimed that UEP's failure to pay for goods received constituted a breach of the parties' consignment agreement and demanded payment on account and the value of motors on consignment. UEP does not dispute it owed Emerson $276,073.78, which remains unpaid.

---

[1]UEP subsequently dismissed the antitrust claim with prejudice.

Emerson later moved for summary judgment on UEP's claims and on its counterclaim, arguing that the plain language of the Agreement allowed it to make direct sales and to increase prices. The district court granted Emerson summary judgment on UEP's claims and Emerson's counterclaims, in part,[2] and later denied UEP's motion for reconsideration, entering partial judgment for Emerson on its counterclaim in the amount of $276,073.78.

UEP now timely appeals, arguing that the district court erred in granting summary judgment on its breach of contract and tortious interference claims and that Emerson should not be entitled to recover on its counterclaims, as it breached the Agreement first. We, like the district court, hold that the clear language of the Agreement did not preclude Emerson from making direct sales or from increasing prices. Accordingly, Emerson's actions constitute neither a contract breach nor tortious interference with business relationships, and Emerson is entitled to the amount it counterclaimed.

## II. Standard of Review

We review de novo the district court's order granting summary judgment and its denial of UEP's motion for reconsideration of that order. *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 389–90 (6th Cir. 2008). We review a summary judgment decision "using the same Rule

---

[2]The district court denied summary judgment as to Emerson's request for attorney's fees and for $9,530.15 of consigned goods in disputed condition upon return. However, the parties subsequently stipulated to increasing the original judgment by this amount to resolve Emerson's remaining counterclaims and an amended judgment was entered on November 5, 2008, in the amount of $276,073.78.

56(c) standard as the district court." *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

## III. Analysis

Because the parties' Agreement provides that Missouri law governs all claims, we proceed by applying Missouri law to evaluate UEP's claimed errors.

*A. Breach of Contract*

UEP argues that the district court improperly granted Emerson summary judgment on its breach of contract claim because: (1) Emerson's direct sales to UEP's customers violated the Agreement; (2) even if the Agreement allowed direct sales, there exists a triable issue of fact as to whether the parties modified the Agreement; and (3) Emerson's conduct violated the implied obligation of good faith and fair dealing inherent in every contract. But UEP fails to demonstrate a genuine issue of material fact to support overturning summary judgment on any of these grounds, and, given the available facts, UEP's arguments fail as a matter of law.

With respect to the first grounds, we agree with the district court that the language in the Agreement is unambiguous. Where a "contract's language is clear, we discern the parties' intent from the document alone" and do not apply rules of construction. *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.3d 355, 357 (Mo. Ct. App. 2004). The Agreement clearly stated that nothing in it shall be construed "as granting any exclusive distributorship or rights" to UEP or as preventing Emerson from freely operating in the market area. Emerson was also free to revise the price of its products per the plain language of the Agreement. UEP argues the conflict between Emerson's ability to sell directly to UEP's customers and UEP's contractual obligation to actively and aggressively promote the sale of such products make the terms "freely operate" ambiguous. We disagree. Emerson's ability to make direct sales to UEP customers does no greater violence to UEP's obligation to sell Emerson products than does "appoint[ing] other distributors in the Market Area," conduct the Agreement explicitly authorized. Having determined there is no ambiguity within the four corners of the Agreement itself, there is no need to resort to construction of the contract based on parties' conduct. *See Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. 2001). We accordingly hold that the Agreement allowed Emerson to make direct sales and to increase its prices, and that Emerson did not, therefore, breach the Agreement.

UEP further asserts there is an issue of fact as to the subsequent modification of the Agreement, pointing to the August 2001 letter from Gary Sajewich as evidence of modification. But although Missouri law allows oral modifications even when a contract specifically requires a writing,

to be effective, these modifications must possess all the elements necessary to form a new contract. *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 902 (Mo. 1990) (citing *Zumwinkel v. Leggett*, 345 S.W.2d 89, 94 (Mo. 1961)). Faced with a record lacking any evidence of consent to modify on Emerson's part or of consideration given by either party, the district court correctly concluded that no modification occurred.

Finally, UEP argues even if Emerson's conduct was authorized under the Agreement, its conduct constituted a violation of the implied obligation of good faith and fair dealing inherent in every contract. This duty prevents a contracting party from exercising a right conferred by an agreement "in a manner that evades the spirt of the transaction or denies the other party the expected benefit of the contract." *Finova Capital Corp. v. Ream*, 230 S.W.3d 35, 45 (Mo. Ct. App. 2007). But this argument also fails because the implied covenant of good faith cannot displace the parties' actual agreement. *Schell v. LifeMark Hosps. of Mo.*, 92 S.W.3d 222, 231 (Mo. Ct. App. 2002). In other words, Missouri law does not allow this covenant to be "an everflowing cornucopia of wished-for legal duties" imposing an obligation not otherwise contained in the contract's terms. *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (citing *Glass v. Mancuso*, 444 S.W.2d 467, 478 (Mo. 1969)). Because the Agreement authorized all of Emerson's actions, its activities failed to interfere with the spirit or benefit of the transaction, and accordingly Emerson did not breach its duty of good faith and fair dealing.

B.  *Tortious Interference*

In addition to its breach of contract claim, UEP asserts that issues of fact preclude summary judgment on its claim for tortious interference.  UEP argues that Emerson's price increase in March 2006 to "break even" and subsequent conduct of selling to UEP's customers at prices below what Emerson charged UEP constituted tortious interference with UEP's business relationships with existing customers.  Emerson counters that it was justified in making direct sales due to its legitimate interest in protecting its own relationships with customers buying Emerson's products, and the Agreement permitted all of its conduct.  Because UEP cannot demonstrate that Emerson used improper means, as required by Missouri law, we conclude the district court correctly granted summary judgment to Emerson on this claim.

Under Missouri law, tortious interference with a contract or business relationship requires a plaintiff to prove: (1) a valid contract or business relationship; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's interference; (4) absence of justification; and (5) damages.  *Clinch v. Heartland Health*, 187 S.W.3d 10, 14 (Mo. Ct. App. 2006) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996)).  But "[i]f the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests."  *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. 1993).  By contrast, "no liability arises if the defendant had an unqualified legal right to do the act complained of."  *Id.*

Because Emerson has legitimate interests in UEP's relationships with its customers—UEP distributed Emerson's products, after all—UEP must demonstrate that Emerson employed improper means. But, as we already concluded, all of Emerson's actions fall within the ambit of its contractual rights. Thus, though UEP argues "when Emerson told UEP that it needed to raise prices to UEP to break even . . . but then turned around and began secretly selling products to UEP's customers for prices that were less than what it claimed was the breakeven price, it crossed the tortious interference line," we disagree. Without breaching the Agreement, Emerson could not have employed improper means, and thus could not have tortiously interfered with UEP's business relationships.

Moreover, none of the cases cited by UEP supports its improper-means argument. Unlike in *Western Fireproofing Co. v. W.R. Grace & Co.*, 896 F.2d 286 (8th Cir. 1990), a case upon which UEP heavily relies, UEP sold the products of several manufacturers, and Emerson did not unfairly join former UEP employees to drive UEP out of business. Also misplaced is UEP's reliance on *Machine Maintenance & Equipment Co. v. Cooper Industries, Inc.*, 661 F. Supp. 1112 (E.D. Mo. 1987), in which some of plaintiff's salespeople left to form a competing distributor and the defendant improperly terminated its agreement with the plaintiff in order to work with the new distributor, using information from the former salespeople to contact customers prior to the agreement's termination. *Id.* at 1114. In this case, Emerson took actions consistent with its contractual obligations. UEP provides no evidence Emerson intended to drive it out of business or improperly contacted UEP employees to interfere with UEP's ongoing business relationships. Thus, because

Emerson's conduct falls far short of the egregious conduct in these cases, we hold that the district court properly granted summary judgment to Emerson on UEP's tortious interference claim.

*C. Counterclaim*

UEP appeals the district court's judgment in favor of Emerson for $276,073.78. Although UEP does not dispute its obligation to Emerson for this amount, it contends that Emerson's material breach of the Agreement suspended its payment obligations. Finding that Emerson complied with the Agreement, we conclude the district court correctly entered judgment on Emerson's counterclaim.

**IV. Conclusion**

For these reasons, we affirm.